T.C. Memo. 2005-67

UNITED STATES TAX COURT

LAURA D. SEIDEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8964-03.                    Filed March 31, 2005.

Laura D. Seidel, pro se.

<u>John Strate</u> and <u>Rex Lee</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  Respondent determined a deficiency in petitioner's Federal income tax of $24,593 and an additional tax of $4,397.87 pursuant to section 72(t) for the taxable year 1999.  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the

year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties, the issues for decision are: (1) Whether petitioner received a taxable distribution of $77,000 from Lee Seidel's (petitioner's former husband) section 401(k) plan (401(k) plan) pursuant to a Qualified Domestic Relations Order (QDRO) which designated her as the alternate payee; (2) whether petitioner is entitled to business deductions and cost of goods sold claimed on Schedule C, Profit or Loss From Business, for an activity named Port of Mystery, involving the sale and repair of antique jewelry; (3) whether petitioner is liable for the 10-percent additional tax pursuant to section 72(t) because she received an early distribution from her own 401(k) plan and from Lee Seidel's 401(k) plan; (4) whether petitioner is entitled to an additional itemized deduction on Schedule A, Itemized Deductions, for taxable year 1999 for mortgage interest in the amount of $2,471.09; (5) whether petitioner is entitled to an additional itemized deduction for legal fees in the amount of $2,058.50 paid to Robert Fruitman, petitioner's divorce attorney, in taxable year 1999; and (6) whether petitioner underwent more than one inspection of her books of account for taxable year 1999.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits thereto are incorporated herein by this reference. Petitioner resided in Yuba City, California, on the date the petition was filed in this case.

Taxability of 401(k) Distribution Pursuant to a QDRO

Petitioner married Lee Seidel (Mr. Seidel) on October 23, 1993. During the marriage, Mr. Seidel was employed by the California Water Service Company (CWSC). Mr. Seidel's employment with CWSC commenced in 1974 and continued beyond the dissolution of the marriage. As an employee of CWSC, Mr. Seidel was a participant in a tax-deferred savings plan (CWSC 401(k)) sponsored by CWSC pursuant to section 401(a) and (k). Mr. Seidel's participation in the CWSC 401(k) plan began sometime between 1983 and 1985, prior to his marriage to petitioner, and continued during the marriage. Mr. Seidel's CWSC 401(k) plan consisted of a separate property interest for contributions made prior to his marriage to petitioner, and a community property interest for contributions made during his marriage to petitioner. The parties agree that the community property interest in Mr. Seidel's CWSC 401(k) plan totals $77,000.

Petitioner and Mr. Seidel each entered the marriage with separate property interests. Petitioner had her own house which was encumbered by a first mortgage. Mr. Seidel had his own house

which he had purchased.  Mr. Seidel's house was encumbered by a first and second mortgage.  After their marriage, Mr. Seidel moved into petitioner's house.

During the beginning years of their marriage, petitioner and Mr. Seidel took out a second mortgage on petitioner's house.  The proceeds of this second mortgage were used to pay off the second mortgage on Mr. Seidel's house, to pay off some of petitioner's debts, and to purchase household assets.

Petitioner and Mr. Seidel separated on February 11, 1998.  During settlement negotiations to dissolve the marriage, petitioner was represented by attorney, Robert Fruitman (Mr. Fruitman).  Mr. Seidel was represented by his attorney, Francis L. Adams (Mr. Adams).  The marriage was dissolved by the Superior Court of California, County of Sutter (California Superior Court), on April 27, 1999.

With respect to the division of Mr. Seidel's CWSC 401(k) plan, petitioner and Mr. Seidel agreed to a Marital Settlement Agreement, dated April 19, 1999, and entered by the California Superior Court on April 27, 1999, which provided:

> the parties presently have a partial community interest [$77,000.00] in Husband's 401K and Husband has a partial separate property interest in his 401K.  The parties agree that the sum of SEVENTY SEVEN THOUSAND DOLLARS AND NO/100 ($77,000.00) shall be withdrawn from the 401K plan held in Husband's name.  Husband will then deduct the federal and/or state penalties and the federal and state taxes and any other taxes for early withdraw [sic] from that amount, and from that remaining balance, Husband shall arrange for the payment of the two (2) debts owed to First Community

Financial Services, which are secured by deeds of trust on wife's home. After those two (2) debts are paid, any balance of the proceeds shall be split equally between the parties. Any proceeds remaining in Husband's 401K plan shall be confirmed to Husband as his sole and separate property.

The Marital Settlement Agreement was reviewed by Lillick & Charles, LLP, Attorneys at Law (Lillick & Charles), and by the administrator of the CWSC 401(k) plan, for whom Lillick & Charles acted as counsel. Based upon this review, the plan administrator refused to comply with the Marital Settlement Agreement because it did not constitute a QDRO. Due to Mr. Seidel's continuing employment, the plan administrator would not distribute the called for amount to Mr. Seidel.

Mr. Fruitman and Mr. Adams negotiated a second Marital Settlement Agreement which incorporated a Domestic Relations Order (DRO). They submitted the proposed QDRO with their respective party's approval to Lillick & Charles on May 28, 1999. The Marital Settlement Agreement did not provide for the payment of funds from petitioner to Mr. Seidel for use in making the mortgage interest payment at issue in the present case. Petitioner expressly waived all spousal support in the Marital Settlement Agreement.

Lillick & Charles advised Mr. Fruitman and Mr. Adams on June 7, 1999, that the proposed DRO was satisfactory, met the requirements of a QDRO, and that the plan administrator would make the distribution pursuant to the QDRO.

On July 19, 1999, Mr. Seidel, Mr. Adams, petitioner, and Mr. Fruitman signed a Stipulation and Order with respect to the QDRO. This Stipulation and Order, which was stamped "Endorsed Filed Aug. 3, 1999" by the Superior Court of the State of California, requested that the Court issue an order as follows:

1. A completed Qualified Domestic Relations Order will be prepared and submitted to the Plan for approval and the Plan will advise counsel of their approval prior to the signatures of the parties and their counsel and prior to the submission to the court.

The parties presently have a partial community interest ($77,000.00) in Husband's 401K and Husband has a partial separate property interest in his 401K. The parties agree that the sum of SEVENTY SEVEN THOUSAND DOLLARS AND ZERO CENTS ($77,000.00) shall be withdrawn from the 401K plan in Wife's name, as an Alternate Payee, and paid over to Wife's attorney. The Plan's administrators will automatically withhold a portion of the Federal and State tax obligation resulting from early withdrawal of the funds. Wife's attorney will pay out of the remaining fund balance an amount sufficient to pay off the two (2) debts owed to First Community Financial Services (in the approximate amount of $28,000), which are secured by a deed of trust on Wife's home. The remaining fund balance shall be used to pay Husband the sum of TEN THOUSAND DOLLARS AND ZERO CENTS ($10,000.00). Any remaining balance shall belong to Wife. Wife's attorney shall accomplish all disbursements from the withdrawn funds within thirty (30) days of receipt. Any proceeds remaining in Husband's 401K plan shall be confirmed to husband as his sole and separate property.

The QDRO issued by the Superior Court of the State of California on August 3, 1999, was stamped "Endorsed Filed". This QDRO stated in paragraph 4:

The AP [alternate payee] account will be distributed upon receipt by the Plan of an endorsed filed copy of this Qualified Domestic Relations Order and an endorsed filed copy of the Stipulation and Order that concerns this Qualified Domestic Relations Order.

Unlike the Stipulation and Order filed August 3, 1999, this QDRO made no mention of the distribution of $10,000 to Mr. Seidel or the distribution of funds to pay the debts secured by the deed of trust. However, the QDRO incorporated into its terms the Stipulation and Order.

Petitioner, through her attorney as her agent, received a net distribution of $60,060 ($77,000 less Federal and State taxes withheld of $16,940). Petitioner also received a Form 1099, Distributions from Pensions, Annuities, Retirement or Profit-Sharing Plans, issued by New York Life Insurance Company for taxable year 1999 reflecting a taxable distribution of $77,000. Upon receipt of this distribution, petitioner did not redeposit the funds into the CWSC 401(k) plan, nor did she roll the funds over into any other qualified plan within the 60-day grace period allowed by section 402(c).[1]

On August 27, 1999, petitioner signed cashier's checks as follows:

---

[1] Although a qualified pension plan is exempt from taxation under sec. 501(a), any amounts actually distributed from such a plan generally must be included in the distributee's gross income. Sec. 402(a). In order to avoid the tax consequence of a plan distribution, the distributee may "roll over" the amount of the distribution into another eligible plan within 60 days. Sec. 402(c).

| Check Number | Payee | Amount |
|---|---|---|
| 2016074195 | Lee Seidel | $10,000.00 |
| 2016074191 | First Community Financial Services | $24,159.66[2] |
| 2016074192 | First Community Financial Services | $6,847.46[2] |

Also during 1999, petitioner received a $10,141.98 distribution from Putnam Investments (her own 401(k) plan) and a $11,567.62 distribution from Standard Insurance Company. However, petitioner reported total pension and annuity distributions on her 1999 Federal income tax return of only $40,172. This amount represents one-half of the net distribution from Mr. Seidel's CWSC 401(k) plan of $30,030 and $10,142 received from Putnam Investments. Therefore, respondent in the notice of deficiency adjusted petitioner's pension and annuity income upward by $58,537. In the notice of deficiency respondent determined (1) that petitioner failed to report the $11,567 distribution from Standard Insurance Company, and the additional $46,970 distribution from New York Life from Mr. Seidel's CWSC

---

[2]These check payments made to First Community Financial Services were made to pay off the principal balance of a second mortgage on petitioner's house, which was a liability assumed during petitioner and Mr. Seidel's marriage, and as such was a joint liability, and to pay off another unspecified joint liability.

401(k) plan, and (2) that petitioner was not entitled to a $5,442 "cost of goods sold" deduction on Schedule C.[3]

Although petitioner reported one-half of the net distribution of $60,060, or $30,030 in gross income on her 1999 Federal income tax return, she claimed the entire credit of $15,400 for the Federal income tax withheld on the $77,000 distribution from Mr. Seidel's CWSC 401(k) plan, together with an itemized deduction on Schedule A of $1,540 for the State and local income taxes withheld on the $77,000 distribution.

Mr. Seidel did not report any part of the distribution from the CWSC 401(k) plan on his Form 1040, U.S. Individual Income Tax Return, for taxable year 1999.

Following the examination by the Internal Revenue Service (IRS) of Mr. Seidel's and petitioner's 1999 Federal income tax returns, Mr. Seidel took the position that petitioner should include the full amount of the distribution of $77,000 in her income for 1999, and petitioner took the position that Mr. Seidel should include one-half of the distribution in his income. As a result, respondent issued notices of deficiency to both Mr. Seidel and petitioner to avoid the possibility of being in a whipsaw position. Respondent determined that Mr. Seidel failed to report $30,030 (one-half of the net distribution) in his

---

[3]The amount of $5,442 which was disallowed by respondent is actually the total net loss reported on Schedule C from petitioner's activity, Port of Mystery.

income for 1999, and petitioner was responsible for additional income in the amount of $46,970. Mr. Seidel filed a petition to this Court at docket No. 8003-03S, in which he contested his liability as to the additional one-half of the net distribution from his CWSC 401(k) plan. Mr. Seidel's case and this case were tried separately on the Court's San Francisco, California, Trial Session beginning on March 1, 2004.

Port of Mystery

During 1997, petitioner began an activity under the name Port of Mystery, to sell and repair antique and estate jewelry. Although petitioner had no prior experience in this field, petitioner claimed she had an "eye" for jewelry. During taxable year 1999, petitioner did not maintain books and records for Port of Mystery, such as a general ledger or other appropriate journals. However, petitioner did attach a Schedule C, Profit or Loss from Business, to her 1999 Federal income tax return. On her Schedule C, petitioner claimed as follows:

| Income | Amount |
|---|---|
| Gross receipts | $750 |
| Less: Cost of goods sold | 4,449 |
| Gross profit | (3,699) |
| Gross income | (3,699) |

| Expenses | |
|---|---|
| Advertising | $25 |
| Car and truck expenses | 273 |
| Depreciation and section 179 expense | 181 |
| Travel expenses | 150 |
| Utilities | 394 |

Other expenses:

| | |
|---|---:|
| Show booth expenses | 500 |
| Bank fees | 120 |
| Security 6% | 57 |
| Pest control 6% | 43 |
| Total expenses | $1,743 |
| Net Business Loss | $5,442 |

As part of her business expenses, petitioner claimed a truck and automobile expense of $273 on her original return and increased such expense to $451 on her "amended return".[4] However, no actual log of expenses or mileage was kept as to petitioner's claimed automobile expense. Petitioner did keep documents of jewelry shows that she claims she attended and records of clients' addresses that petitioner allegedly visited on business matters. Petitioner did not keep a mileage log for any business trips made in taxable year 1999. As to her other business expenses, petitioner does not know how these expenses and deductions were calculated.

Petitioner was disabled and unable to work from February to June 1999. While on disability, petitioner spent no time on her jewelry activity, the Port of Mystery. During taxable year 1999, petitioner participated in only two shows to exhibit Port of Mystery jewelry. The first show was a 3-day show which was held in Sacramento, California; the second was a 2-day show which was held in Marysville, California.

---

[4]Such amended return was not filed with the Internal Revenue Service but was merely exchanged with respondent's counsel as part of the parties' informal document exchange.

Petitioner admitted that she "didn't know anything about antique and estate jewelry as to value before [she] started the business." During taxable year 1999, petitioner purchased a considerable number of books and periodicals to assist her in learning the business of selling and repairing antique and estate jewelry.

Additional Tax--Section 72(t)

During taxable year 1999, petitioner received a taxable distribution from her 401(k) plan held by Putnam Investments of $10,412. Petitioner was "nearing [her] 40th birthday" in 1999.

Audit Examination

Petitioner timely filed a Form 1040 for taxable year 1999. Petitioner attached to her Form 1040 for taxable year 1999 a "Special Handling" cover letter requesting a review of her return. Respondent mailed petitioner a letter dated June 9, 2000, thanking her for her inquiry and stating that the IRS had not "resolved the matter." Petitioner received a letter dated September 14, 2001, advising her that based upon review of third party records, respondent proposed changes to her Form 1040 for taxable year 1999. Petitioner never entered into a closing agreement with the IRS with respect to taxable year 1999. Petitioner never received a letter stating that the IRS had accepted her 1999 tax return, nor had she received a letter stating that her 1999 tax return had been audited as requested.

Petitioner also submitted a Form 1040X, Amended U.S. Individual Income Tax Return, for taxable year 1999 to respondent's counsel as part of the parties' informal document exchange but did not file the Form 1040X with the IRS.

## OPINION

As a general rule, the determinations of the Commissioner in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving the Commissioner's determinations in the notice of deficiency to be in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

### 1.  Taxability of 401(k) Distribution Pursuant to a QDRO

As previously stated, because Mr. Seidel took the position that petitioner should include the full amount of the distribution in income and petitioner took the position that Mr. Seidel should include one-half of the distribution in income, respondent issued notices of deficiency to Mr. Seidel and petitioner to avoid the possibility of being in a whipsaw position.  Thus, respondent asserted that Mr. Seidel was responsible for including the unreported income in the amount of $30,030 on his 1999 tax return, and respondent also asserted that petitioner was responsible for including in income the amount of $46,970 representing the difference between $77,000 and the $30,030 reported on her 1999 tax return.

In the present circumstance, respondent is caught in a potential "whipsaw" position. A whipsaw occurs when different taxpayers treat the same transaction involving the same items inconsistently, thus creating the possibility that income could go untaxed or two unrelated parties could deduct the same expenses on their separate returns. In such circumstances, respondent is fully entitled to defend against inconsistent results by determining in notices of deficiency that both parties to the transaction are liable for the deficiency. Estate of Dooley v. Commissioner, T.C. Memo. 1992-557; Moore v. Commissioner, T.C. Memo. 1989-306.

Petitioner contends that Mr. Seidel should be liable for one-half of the QDRO distribution: (1) Due to the community property law of California; or (2) due to the "beneficial receipt of the proceeds by Mr. Seidel". We note that contrary to her contention, petitioner claimed the entire credit of $15,400 for the Federal income tax withheld on the total $77,000 distribution from Mr. Seidel's CWSC 401(k) plan, together with the entire itemized deduction of $1,540 for the State and local income taxes withheld on the $77,000 distribution.

Generally, under section 402(a), a distribution from a qualified retirement plan is taxed to the distributee. Section 402(a) provides in part:

> Except as otherwise provided in this section, any

amount actually distributed to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to the distributee, in the taxable year of the distributee in which distributed, under section 72 (relating to annuities).

Under section 402(a), the general rule is that a distribution from an exempt employees' trust (under a tax-qualified employees' plan) is taxed to the "distributee" under section 72, which generally provides for current taxation of distributions as ordinary income.

The Code does not define the word "distributee" as used in section 402(a), neither do the regulations. The Court has concluded that a distributee of a distribution under a plan ordinarily is the participant or beneficiary who, under the plan, is entitled to receive the distribution. See Darby v. Commissioner, 97 T.C. 51, 58 (1991); Estate of Machat v. Commissioner, T.C. Memo. 1998-154; Smith v. Commissioner, T.C. Memo. 1996-292.

Section 402(e)(1)(A), however, provides an exception to this general rule. Section 402(e)(1)(A) provides that an "alternate payee" who is the spouse or former spouse of the plan participant shall be treated as the distributee of any distribution or payment made to the "alternate payee" under a "qualified domestic relations order" as defined in section 414(p). Therefore, a distribution made to such an alternate payee under a QDRO will be taxable to the alternate payee, and not to the plan participant,

because section 402(e)(1)(A) treats the alternate payee as the distributee.

The Retirement Equity Act of 1984 (REA 1984), Pub. L. 98-397, sec. 204(b), 98 Stat. 1445, added section 414(p), which defines a QDRO. Section 414(p) provides, in pertinent part, the following:

SEC. 414(p). Qualified Domestic Relations Order Defined.--For purposes of this subsection and section 401(a)(13)--

(1) In General.--

(A) Qualified domestic relations order.--The term "qualified domestic relations order" means a domestic relations order--

(i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(ii) with respect to which the requirements of paragraphs (2) and (3) are met.

(B) Domestic Relations Order.--The term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which--

(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(ii) is made pursuant to a State domestic relations law (including a community property law).

Prior to the enactment of the Retirement Equity Act, some courts had held that State law domestic support orders assigning or

attaching pension benefits were preempted by ERISA's spendthrift provision. S. Rept. 98-575, at 20 (1984), 1984-2 C.B. 447, 456 (recognizing conflicting decisions). Congress's primary intent in recognizing the QDRO exception was to clarify that these domestic support obligations did not fall within the scope of ERISA preemption. See Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 838-839 (1988).

The parties are in agreement that Mr. Seidel's CWSC 401(k) plan meets the requirements of section 401(a). That being so, distributions from the CWSC 401(k) plan are governed by section 402.

Petitioner relies on Powell v. Commissioner, 101 T.C. 489 (1993), in arguing that the funds distributed through the QDRO remained community property and should be taxed as an indirect distribution. Interpreting Darby v. Commissioner, supra, the Court in Powell v. Commissioner, supra at 498, stated that "an owner was not necessarily a distributee and * * * [that Darby] specifically observed that its statement that a 'distributee' had to be a participant or beneficiary was not an exclusive definition of that word." Applying the law as modified by REA 1984, the Court in Powell found that the plan participant's former spouse was the "distributee" and thereby taxable on her share of the pension benefits. Id.

The QDRO incorporated by its own terms the Stipulation and Order filed August 3, 1999. The QDRO also included a calculation of the community property interest in Mr. Seidel's CWSC 401(k) plan and the Stipulation and Order provided for the division of such community property interest. The terms of the Stipulation and Order governed petitioner's actions and those of her attorney as to the proceeds received through the distribution from Mr. Seidel's CWSC 401(k) plan. The Stipulation and Order required petitioner's attorney to pay out of the fund so distributed, within 30 days of its receipt by him, two liabilities owed jointly by petitioner and Mr. Seidel to First Community Financial Services, and to pay to Mr. Seidel $10,000. In fact, petitioner's attorney made these payments, and petitioner never actually received the proceeds that went to fulfill these obligations.

Based on the particular facts of this case, we find that under the present QDRO, which by its terms incorporated the Stipulation and Order filed August 3, 1999, petitioner was alternate payee of only a portion of the distribution; i.e., $51,497. This amount consists of the whole distribution of $77,000 less $25,503. The amount of $25,503 is attributable to Mr. Seidel as beneficiary and distributee, and it consists of

$15,503, which is one-half of the two joint liabilities paid off by the proceeds of the CWSC 401(k) distribution, plus the $10,000 check given to Mr. Seidel from the proceeds of the CWSC 401(k) distribution in compliance with the Stipulation and Order.

Therefore, petitioner is liable for the tax on the additional portion of the distribution in the amount of $21,467, which she has not reported and of which she was the beneficiary and alternate payee.

As stated in Powell v. Commissioner, supra at 498-499:

> Our conclusion is not affected by the fact that initially the entire distribution was made to [petitioner]. We think [she] received the distribution * * * on behalf of the community and that [her] later payment to [Mr. Seidel], [by way of cash and relief of joint liabilities], was a transfer to [him] of funds that at all times belonged to [him].

2. Schedule C Deductions for the Port of Mystery

Under section 162, a taxpayer may deduct the ordinary and necessary expenses paid or incurred during the taxable year in carrying on his or her trade or business. A taxpayer is engaged in a trade or business if the taxpayer is involved in the activity (1) with continuity and regularity, and (2) with the primary purpose of making a profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 686 (1988).

Petitioner has the burden of proving that she was engaged in a trade or business, i.e., Port of Mystery, and that she is

entitled to the deductions claimed.[5] Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933). Section 7491(a) shifts the burden of proof to the Commissioner respecting tax liability under certain circumstances. The burden does not shift in this case because petitioner neither alleged that section 7491(a) was applicable nor established that she fully complied with the statutory substantiation requirements of section 7491 as shown below. Sec. 7491(a)(2)(A) and (B).

If petitioner fails to establish Port of Mystery's entitlement to the deductions under section 162,[6] and fails to show error in respondent's determination that Port of Mystery was an activity not engaged in for profit, then section 183 limits

---

[5]The Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726, added sec. 7491(a), which is applicable to Court proceedings arising in connection with examinations commencing after July 22, 1998. Under sec. 7491(a), Congress requires the burden of proof to be placed on the Commissioner, where a taxpayer introduces credible evidence with respect to factual issues relevant to ascertaining the taxpayer's liability for tax, and meets certain other requirements. In the instant case, petitioner has not raised the application of this provision, and petitioner has not presented such credible evidence, nor met all other applicable requirements; therefore, the burden remains with petitioner.

[6]Sec. 183(c) provides that an activity is not engaged in for profit if the activity is "other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Port of Mystery's deductions for expenses attributable to the activity, as provided in section 183(b).

Section 162(a) allows a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. To be "ordinary" the transaction which gives rise to the expense must be of a common or frequent occurrence in the type of business involved. Deputy v. du Pont, 308 U.S. 488, 495 (1940). To be "necessary" an expense must be "appropriate and helpful" to the taxpayer's business. Welch v. Helvering, supra at 113-114.

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he or she is entitled to any deduction claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, supra. This includes the burden of substantiation. Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Section 6001 and the regulations promulgated thereunder require taxpayers to maintain records sufficient to permit verification of income and expenses. As a general rule, if the trial record provides sufficient evidence that the taxpayers have incurred a deductible expense, but the taxpayer is unable to adequately substantiate the precise amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of the deductible expense and allow the deduction to that

extent, bearing heavily against the taxpayer whose inexactitude in substantiating the amount of the expense is of his own making. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). However, in order for the Court to estimate the amount of an expense, the Court must have some basis upon which an estimate may be made. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Without such a basis, any allowance would amount to unguided largesse. Williams v. United States, 245 F.2d 559, 560-561 (5th Cir. 1957). Further, section 274(d) prohibits the estimation of expenses for travel or deductions with respect to certain listed property; thus, the Cohan rule does not apply to these types of expenses. Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969). Listed property includes automobiles. Sec. 280F(d)(4).

During taxable year 1999, petitioner did not maintain books and records for her jewelry activity, Port of Mystery, such as a general ledger or other appropriate journals. Petitioner purportedly kept "notes" of cash receipts received through her activity. However, petitioner claims that she could not produce such receipts because her computer, which contained a record of such receipts and notes, "crashed". Petitioner did not attempt to reconstruct her records after her computer purportedly failed.

Petitioner claimed she incurred cost of goods sold in the amount of $4,449 on her original return but changed such claim

for cost of goods sold to $2,007 on her "amended return".[7] However, as stated above, petitioner did not maintain proper books or even notes to substantiate such a claim. Therefore, we hold that petitioner is not entitled to any claim for cost of goods sold during the taxable year 1999.

Petitioner claimed a truck and automobile expense of $273 on her original return and has increased such expense to $451 on her "amended return". No actual log of expenses or mileage was kept as to petitioner's claimed automobile expense. However, petitioner did keep documents of shows that she claims she attended and records of clients' addresses that petitioner allegedly visited on business matters. In addition, petitioner introduced into evidence parking receipts from Sacramento and a check from a client in the Bay Area, both of which petitioner claims substantiates her travel to these areas. Petitioner attempts to use these such documents to substantiate her claimed automobile expense. However, petitioner did not keep a mileage log for such trips.

Aside from the above-mentioned parking receipts, check, and other documents, petitioner offered no further records to substantiate her travel or automobile expenses. Her evidence

---

[7]Such amended return, as previously noted, was not filed with the Internal Revenue Service but was merely exchanged with respondent's counsel as part of the parties' informal document exchange.

does not meet the substantiation requirements of section 274 because it does not show mileage traveled, route taken, or business purpose of these expenses.  Sec. 274(d).

As to petitioner's other Schedule C deductions, including utilities expense, cable expense, and bank charges, petitioner testified that she did not know how these deductions were calculated.  She did not substantiate such expenses.  Therefore, this Court holds that such deductions are not allowed and respondent's disallowance of such deductions is sustained.

Due to our holding that petitioner has not substantiated any of the claimed Schedule C deductions for Port of Mystery, it is not necessary for us to determine whether Port of Mystery was an activity engaged in for profit.

3.  Additional Tax--Section 72

Generally, section 72(t)(1) imposes a 10-percent additional tax on early distributions from qualified retirement plans,[8] unless the distribution comes within one of several statutory exceptions.  For example, distributions that are made on or after the date on which the taxpayer attains the age of 59½ are not "early", and therefore not subject to the 10-percent additional tax.  Sec. 72(t)(2)(A)(i).  As relevant to the present case, section 72(t)(2)(C) provides an exception for distributions "to

---

[8]As relevant to the present case, a "qualified retirement plan" includes an individual retirement account (IRA) and a qualified pension or profit-sharing plan.  Sec. 4974(c)(1), (4).

an alternate payee pursuant to a qualified domestic relations order".

In the present situation, the QDRO, issued in connection with Mr. Seidel's CWSC 401(k) plan, designated petitioner as the alternate payee of $51,497 of the distribution as we have found. Therefore, petitioner is not liable for the 10-percent additional tax pursuant to section 72(t) with respect to the portion of the $77,000 distribution from Mr. Seidel's CWSC 401(k) plan that is includable in her gross income as the alternate payee. Sec. 72(t)(2)(C).

However, petitioner concedes that she received a taxable distribution from her 401(k) plan held by Putnam Investments for taxable year 1999 in the amount of $10,412. Petitioner also testified that she was "nearing [her] 40th birthday" in the taxable year 1999. Therefore, the distribution from petitioner's 401(k) plan is considered "early" and subject to the 10-percent additional tax, unless one of the enumerated statutory exceptions applied. Petitioner put forth no arguments that an exception applied to such distribution; thus the distribution of $10,412 from Putnam Investments is subject to the 10-percent additional tax under section 72(t).

4. Mortgage Interest Deduction

Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Section

163(h)(1), however, provides that, in the case of a taxpayer other than a corporation, no deduction is allowed for personal interest. Qualified residence interest is excluded from the definition of personal interest and thus is deductible under section 163(a). See sec. 163(h)(2)(D). Qualified residence interest is any interest which is paid or accrued during the taxable year on acquisition indebtedness or home equity indebtedness. See sec. 163(h)(3)(A). Acquisition indebtedness is any indebtedness secured by the qualified residence of the taxpayer or incurred in acquiring, constructing, or substantially improving the qualified residence. See sec. 163(h)(3)(B). Home equity indebtedness is any other indebtedness secured by the qualified residence to the extent the aggregate amount of such indebtedness does not exceed the fair market value of the qualified residence reduced by the amount of acquisition indebtedness on the residence. See sec. 163(h)(3)(C)(i). The amount of home equity indebtedness for any taxable year cannot exceed $100,000. See sec. 163(h)(3)(C)(ii). The indebtedness generally must be an obligation of the taxpayer and not an obligation of another. See Golder v. Commissioner, 604 F.2d 34, 35 (9th Cir. 1979), affg. T.C. Memo. 1976-150.

However, a deduction with respect to interest arising out of a joint obligation of a taxpayer and another party is only allowable to the taxpayer to the extent he or she makes payment

of the interest out of his or her own funds.  See Finney v. Commissioner, T.C. Memo. 1976-329, and authorities cited therein.

In Finney, the taxpayer and his wife were separated during the taxable year 1971 and held a residence as tenants by the entirety during that year.  Although the mortgage interest payments were nominally made by the taxpayer's wife, this Court concluded that he had satisfied his burden of proving that the funds used to make the interest payments were his funds, and he was therefore entitled to the deduction.  However, in reaching this conclusion we relied upon a stipulation entered into between respondent, the husband, and the wife that the funds used to make the interest payments were supplied by the husband.

Another case dealing with this issue is Kohlsaat v. Commissioner, 40 B.T.A. 528 (1939).  In Kohlsaat, the Board of Tax Appeals[9], likewise, concluded that taxpayer-husband was entitled to a deduction for mortgage interest payments made with respect to a former marital residence even though the payments were nominally made by his ex-wife.  However, in that case the divorce decree provided that in addition to his obligation to make monthly alimony payments to his ex-wife, he was directed to pay $225 per month to his ex-wife, and she was directed to use these funds to make the mortgage payments for which he was

---

[9]The Revenue Act of 1942, ch. 619, 56 Stat. 798, established the Tax Court of the United States on Oct. 21, 1942, which superseded the United States Board of Tax Appeals.

primarily and personally liable.  Because of these circumstances, the Board concluded: "No part of the $225 monthly payments represented alimony or any 'allowance' to the wife.  She could not use the funds for any other purpose than to pay the carrying charges on the mortgaged property and to reduce the principal mortgage debt.  In so doing she acted as agent or trustee for the petitioner."  Kohlsaat v. Commissioner, supra at 534.

Petitioner provided no documentation, such as canceled checks or Forms 1099, that substantiates her claim that she made payments of mortgage interest in the amount of $2,471.09 in taxable year 1999.  Petitioner's only evidence, in this respect, is a statement from First Community Financial Services addressed to Mr. Seidel reflecting that he paid $2,471.09 in interest in taxable year 1999.  Since there is no evidence that petitioner's funds were in fact used to make these payments, and the burden of proof is upon her to establish that it was in fact her funds that were used to make the payments, we must conclude that petitioner is not entitled to the deduction claimed because she has not established that the payments were made with her funds.  Rule 142; Diez-Arguelles v. Commissioner, T.C. Memo. 1984-356; Kazupski v. Commissioner, T.C. Memo. 1982-182; Finney v. Commissioner, supra; Kohlsaat v. Commissioner, supra.

5. <u>Attorney's Fees Deduction</u>

At trial, petitioner claimed an itemized deduction on Schedule A for attorney's fees in the amount of $2,058.50.

Personal, living, and family expenses generally are not deductible by taxpayers.  Sec. 262(a).  Attorney's fees and other costs paid in connection with a divorce generally are personal expenses and therefore nondeductible.  Sec. 1.262-1(b)(7), Income Tax Regs.  On the other hand, expenses paid for the production or collection of income, or in connection with the determination, collection, or refund of any tax, generally are deductible.  Sec. 212(1), (3).  This is the case even if the expenses are paid in connection with a divorce.  <u>Swain v. Commissioner</u>, T.C. Memo. 1996-22, affd. without published opinion 96 F.3d 1439 (4th Cir. 1996); sec. 1.262-1(b)(7), Income Tax Regs.

The legal fees which petitioner paid to her attorney were paid in order to secure petitioner's divorce and property settlement.  Petitioner expressly waived all spousal support (i.e., alimony).  However, a portion of petitioner's attorney's fees was paid in order to secure the production of income; namely, the distribution from Mr. Seidel's CWSC 401(k) plan includable in her income as alternate payee.  Therefore, under section 212 and under the <u>Cohan</u> rule, we may estimate the amount of the Schedule A itemized deductible expense.  Thus, we hold

that petitioner may claim a deduction for attorney's fees in the amount of $1,377.[10]

6.  Audit Examination

Section 7605(b) provides:

No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

This Court stated in Digby v. Commissioner, 103 T.C. 441, 445 (1994):

The Supreme Court, after a review of the legislative history, interpreted the purpose of section 7605(b) as being congressional recognition of "a need for a curb on the investigating powers of low-echelon revenue agents, and considered that it met this need simply and fully by requiring such agents to clear any repetitive examination with a superior." United States v. Powell, 379 U.S. 48, 55-56 (1964); 61 Cong. Rec. 5855 (Sept. 28, 1921). The Powell case involved the enforcement of a summons to appear before a special agent and produce for reexamination certain corporate records, on the ground that suspected fraud would reopen the expired 3-year period of limitations on assessment and collection. Section 7605(b) was considered in that context to determine whether that section, either alone or in conjunction with others, placed a probable cause standard or other restrictions on the Commissioner's agents before a tax year may be reexamined. The Supreme Court held, with respect to section 7605(b) that, generally, "no severe restriction was intended", and regarding unnecessary examinations, courts are not required "to oversee the Commissioner's determinations to investigate." United States v. Powell, supra at 54, 56.

---

[10]This amount was arrived at by multiplying petitioner's total attorney's fees by a fraction, the numerator of which is the taxable portion of CASC 401(k) plan distribution and the denominator of which is the total amount of the CASC 401(k) plan distribution ($2,058.50 x ($51,497 ÷ $77,000) = $1,377).

Thus, the Internal Revenue Service is generally limited to one inspection of a taxpayer's books and records for each taxable year unless the taxpayer requests a second audit or the Service notifies the taxpayer in writing that an additional inspection is necessary. United States v. Powell, supra; De Masters v. Arend, 313 F.2d 79, 85 (9th Cir. 1963).

However, the review of records of third parties does not constitute an inspection of the taxpayer's books and records. Digby v. Commissioner, supra at 447. Moreover, mere communication with the taxpayer does not fall within the scope of an inspection of books and records. Benjamin v. Commissioner, 66 T.C. 1084, 1098-1099 (1976), affd. 592 F.2d 1259 (5th Cir. 1979).

With this background we consider petitioner's contention that respondent has violated the requirements of section 7605(b) by subjecting petitioner to three separate inspections of her books and records.

Petitioner attached to her Form 1040 for taxable year 1999, a "Special Handling" cover letter requesting a review of her return. Petitioner presented no evidence that respondent audited her return as a result of this request. In fact, respondent mailed petitioner a letter thanking her for her inquiry and stating that the IRS had not "resolved the matter." Such a response to a taxpayer's inquiry does not constitute an

inspection of her books of account.  See <u>Benjamin v. Commissioner</u>, <u>supra</u>.

Petitioner received a letter dated September 14, 2001, advising her that based upon review of third party records, respondent proposed changes to her Form 1040 for taxable year 1999.  The review of records of third parties does not constitute a review of a taxpayer's books and records.  <u>Digby v. Commissioner</u>, <u>supra</u>.

Petitioner's argument that respondent has violated section 7605(b) is grounded on respondent's issuing to petitioner a tax refund before auditing her 1999 tax return.  Petitioner admits that she never entered into a closing agreement with the IRS with respect to taxable year 1999.  Petitioner also admits that she never received a letter stating that the IRS had accepted her 1999 tax return, nor had she received a letter stating that her 1999 tax return had been audited as requested by her special handling request.

Instead, petitioner's argument of multiple audits relies on petitioner's testimony that her refund was evidence of an audit that resulted from her special handling request.  Such testimony and argument do not substantiate her claim of a violation of section 7605(b).

There is no evidence in the record that substantiates petitioner's claim that the IRS audited her income tax return by

inspecting her books of account before issuing petitioner her 1999 income tax refund.  We hold that respondent did not subject petitioner to multiple inspections of her books of account and thus did not violate section 7605(b).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.