T.C. Summary Opinion 2005-51

UNITED STATES TAX COURT

LEE E. SEIDEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8003-03S.                    Filed April 19, 2005.

Lee E. Seidel, pro se.

<u>John W. Strate</u> and <u>Rex Lee</u>, for respondent.

GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioner's Federal income tax of $9,170 for taxable year 1999.  In the notice of deficiency, respondent increased petitioner's gross income by $30,030 and reduced by $601 the miscellaneous itemized deductions taken by petitioner.

The issue for decision is whether petitioner is taxable on one-half of the net distribution of $60,060 made from his California Water Service Company 401(k) plan pursuant to a marital settlement agreement dissolving his marriage to Laura Seidel (Ms. Seidel).  Respondent's computational adjustment of $601 to petitioner's claimed miscellaneous itemized deductions will be resolved by our holding on the issue.

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits thereto are incorporated herein by this reference.  Petitioner resided in Yuba City, California, on the date the petition was filed in this case.

Petitioner married Ms. Seidel on October 23, 1993.  During the marriage, petitioner was employed by the California Water Service Company (CWSC).  Petitioner's employment with CWSC commenced in 1974 and continued beyond the dissolution of the marriage.  As an employee of CWSC, petitioner was a participant in a tax-deferred savings plan (CWSC 401(k)) sponsored by CWSC pursuant to section 401(a) and (k).  Petitioner's participation

in the CWSC 401(k) plan began sometime between 1983 and 1985, prior to his marriage to Ms. Seidel, and continued during the marriage.  Petitioner's CWSC 401(k) plan consisted of a separate property interest for contributions made prior to his marriage to Ms. Seidel and a community property interest for contributions made during his marriage to Ms. Seidel.  The parties agree that the community property interest in petitioner's CWSC 401(k) plan totals $77,000.

Petitioner and Ms. Seidel each entered the marriage with separate property interests.  Ms. Seidel had her own house, which was encumbered by a first mortgage.  Petitioner had his own house, which he had purchased.  Petitioner's house was encumbered by a first and second mortgage.  After their marriage, petitioner moved into Ms. Seidel's house.

During the beginning years of their marriage, petitioner and Ms. Seidel took out a second mortgage on Ms. Seidel's house.  The proceeds of this second mortgage were used to pay off the second mortgage on petitioner's house, to pay off some of Ms. Seidel's debts, and to purchase household assets.

Petitioner and Ms. Seidel separated on February 11, 1998. During settlement negotiations to dissolve the marriage, Ms. Seidel was represented by an attorney, Robert Fruitman (Mr. Fruitman).  Petitioner was represented by his attorney, Francis L. Adams (Mr. Adams).  The marriage was dissolved by the Superior

Court of California (California Superior Court), County of Sutter, on April 27, 1999.

With respect to the division of petitioner's CWSC 401(k) plan, Ms. Seidel and petitioner agreed to a Marital Settlement Agreement, dated April 19, 1999, and entered by the California Superior Court on April 27, 1999, which provided:

> the parties presently have a partial community interest [$77,000.00] in Husband's 401K and Husband has a partial separate property interest in his 401K. The parties agree that the sum of SEVENTY SEVEN THOUSAND DOLLARS AND NO/100 ($77,000.00) shall be withdrawn from the 401K plan held in Husband's name. Husband will then deduct the federal and/or state penalties and the federal and state taxes and any other taxes for early withdraw [sic] from that amount, and from that remaining balance, Husband shall arrange for the payment of the two (2) debts owed to First Community Financial Services, which are secured by deeds of trust on wife's home. After those two (2) debts are paid, any balance of the proceeds shall be split equally between the parties. Any proceeds remaining in Husband's 401K plan shall be confirmed to Husband as his sole and separate property.

The Marital Settlement Agreement was reviewed by Lillick & Charles, LLP, Attorneys at Law (Lillick & Charles), and by the administrator of the CWSC 401(k) plan, for whom Lillick & Charles acted as counsel. Based upon this review, the plan administrator refused to comply with the Marital Settlement Agreement because it did not constitute a Qualified Domestic Relations Order (QDRO). Due to petitioner's continuing employment, the plan administrator would not distribute the called for amount to petitioner.

Mr. Fruitman and Mr. Adams negotiated a second Marital Settlement Agreement which incorporated a Domestic Relations Order (DRO). They submitted the proposed QDRO with their respective party's approval to Lillick & Charles on May 28, 1999. Ms. Seidel expressly waived all spousal support in the Marital Settlement Agreement.

Lillick & Charles advised Mr. Fruitman and Mr. Adams on June 7, 1999, that the proposed DRO was satisfactory, met the requirements of a QDRO, and that the plan administrator would make the distribution pursuant to the QDRO.

On July 19, 1999, petitioner, Mr. Adams, Ms. Seidel, and Mr. Fruitman signed a Stipulation and Order with respect to the QDRO. This Stipulation and Order, which was stamped "Endorsed Filed Aug. 3, 1999" by the California Superior Court, requested that the court issue an order as follows:

> 1. A completed Qualified Domestic Relations Order will be prepared and submitted to the Plan for approval and the Plan will advise counsel of their approval prior to the signatures of the parties and their counsel and prior to the submission to the court.
>
> The parties presently have a partial community interest ($77,000.00) in Husband's 401K and Husband has a partial separate property interest in his 401K. The parties agree that the sum of SEVENTY SEVEN THOUSAND DOLLARS AND ZERO CENTS ($77,000.00) shall be withdrawn from the 401K plan in Wife's name, as an Alternate Payee, and paid over to Wife's attorney. The Plan's administrators will automatically withhold a portion of the Federal and State tax obligation resulting from early withdrawal of the funds. Wife's attorney will pay out of the remaining fund balance an amount sufficient to pay off the two (2) debts owed to First Community Financial Services (in the approximate

amount of $28,000), which are secured by a deed of trust on Wife's home.  The remaining fund balance shall be used to pay Husband the sum of TEN THOUSAND DOLLARS AND ZERO CENTS ($10,000.00).  Any remaining balance shall belong to Wife.  Wife's attorney shall accomplish all disbursements from the withdrawn funds within thirty (30) days of receipt.  Any proceeds remaining in Husband's 401K plan shall be confirmed to husband as his sole and separate property.

The QDRO issued by the California Superior Court on August 3, 1999, was stamped "Endorsed Filed".  This QDRO stated in paragraph 4:

The AP [alternate payee] account will be distributed upon receipt by the Plan of an endorsed filed copy of this Qualified Domestic Relations Order and an endorsed filed copy of the Stipulation and Order that concerns this Qualified Domestic Relations Order.

Unlike the Stipulation and Order filed August 3, 1999, this QDRO made no mention of the distribution of $10,000 to petitioner or the distribution of funds to pay the debts secured by the deed of trust.  However, the QDRO incorporated into its terms the Stipulation and Order.

Ms. Seidel, through her attorney as her agent, received a net distribution of $60,060 ($77,000 less Federal and State taxes withheld of $16,940).  Ms. Seidel also received a Form 1099-R, Distributions from Pensions, Annuities, Retirement or Profit-Sharing Plans, issued by New York Life Insurance Company for taxable year 1999 reflecting a taxable distribution of $77,000.  Upon receipt of this distribution, Ms. Seidel did not redeposit the funds into the CWSC 401(k) plan, nor did she roll the funds

over into any other qualified plan within the 60-day grace period allowed by section 402(c).[1]

On August 27, 1999, Ms. Seidel signed cashier's checks as follows:

| Check No. | Payee | Amount |
|-----------|-------|--------|
| 2016074195 | Lee Seidel | $10,000.00 |
| 2016074191 | First Community Financial Services | [1]$24,159.66 |
| 2016074192 | First Community Financial Services | [1]$6,847.46 |

[1]These check payments made to First Community Financial Services were made to pay off the principal balance of a second mortgage on petitioner's house, which was a liability assumed during petitioner and Ms. Seidel's marriage, and as such was a joint liability, and to pay off another unspecified joint liability.

However, Ms. Seidel reported only $30,030 of the $77,000 pension distribution on her 1999 Federal income tax return. This amount represents one-half of the net distribution from petitioner's CWSC 401(k) plan. In the notice of deficiency mailed to Ms. Seidel respondent determined that she failed to report the additional $46,970 distribution from New York Life from petitioner's CWSC 401(k) plan.

---

[1]Although a qualified pension plan is exempt from taxation under sec. 501(a), any amounts actually distributed from such a plan generally must be included in the distributee's gross income. Sec. 402(a). In order to avoid the tax consequence of a plan distribution, the distributee may "roll over" the amount of the distribution into another eligible plan within 60 days. Sec. 402(c).

Although Ms. Seidel reported one-half of the net distribution of $60,060, or $30,030 in gross income on her 1999 Federal income tax return, she claimed the entire credit of $15,400 for the Federal income tax withheld on the $77,000 distribution from petitioner's CWSC 401(k) plan, together with an itemized deduction on Schedule A of $1,540 for the State and local income taxes withheld on the $77,000 distribution.

Petitioner did not report any part of the distribution from the CWSC 401(k) plan on his Form 1040, U.S. Individual Income Tax Return, for taxable year 1999.

Following the examination by the Internal Revenue Service (IRS) of petitioner's and Ms. Seidel's 1999 Federal income tax returns, petitioner took the position that Ms. Seidel should include the full amount of the distribution of $77,000 in her income for 1999, and Ms. Seidel took the position that petitioner should include one-half of the distribution in his income.  As a result, respondent issued notices of deficiency to both petitioner and Ms. Seidel to avoid the possibility of being in a whipsaw position.  Respondent determined that petitioner failed to report $30,030 (one-half of the net distribution) in his income for 1999, and Ms. Seidel was responsible for additional income in the amount of $46,970.  Ms. Seidel filed a petition to this Court at docket No. 8964-03, in which she contested her liability as to the additional one-half of the net distribution,

which she did not report on her 1999 income tax return, from petitioner's CWSC 401(k) plan. Ms. Seidel's case and this case were tried separately on the Court's San Francisco, California, Trial Session beginning on March 1, 2004. On March 31, 2005, we filed an opinion in Ms. Seidel's case. Seidel v. Commissioner, T.C. Memo. 2005-67.

## Discussion

As a general rule, the determinations of the Commissioner in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving the Commissioner's determinations in the notice of deficiency to be in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We decide the issue in this case without regard to the burden of proof. Accordingly, we need not decide whether the general rule of section 7491(a)(1) is applicable in this case. See Higbee v. Commissioner, 116 T.C. 438 (2001).

## Taxability of Section 401(k) Distribution Pursuant to QDRO

As previously stated, because petitioner took the position that Ms. Seidel should include the full amount of the distribution in income and Ms. Seidel took the position that petitioner should include one-half of the distribution in income, respondent issued notices of deficiency to petitioner and Ms. Seidel to avoid the possibility of being in a whipsaw position. Thus, respondent asserted that petitioner was responsible for

including the unreported income in the amount of $30,030 on his 1999 tax return, and respondent also asserted that Ms. Seidel was responsible for including in income the amount of $46,970 representing the difference between $77,000 and the $30,030 reported on her 1999 tax return.

In the present circumstance, respondent is caught in a potential "whipsaw" position. A whipsaw occurs when different taxpayers treat the same transaction involving the same items inconsistently, thus creating the possibility that income could go untaxed or two unrelated parties could deduct the same expenses on their separate returns. In such circumstances, respondent is fully entitled to defend against inconsistent results by determining in notices of deficiency that both parties to the transaction are liable for the deficiency. Estate of Dooley v. Commissioner, T.C. Memo. 1992-557; Moore v. Commissioner, T.C. Memo. 1989-306.

Respondent in the notice of deficiency determined that petitioner is responsible for including the unreported income from the CWSC 401(k) plan distribution in the amount of $30,030. However, at trial respondent conceded that petitioner should be liable for tax on the following portions of the QDRO distribution: (1) Petitioner's receipt of a cash payment in the amount of $10,000 from Ms. Seidel after her attorney received the distribution pursuant to the QDRO; and (2) petitioner's portion

of the debts to First Community Financial Services, in the amount of $15,503, which were paid off by the proceeds received from the distribution pursuant to the QDRO. Respondent relies on the reasoning put forth by this Court in Darby v. Commissioner, 97 T.C. 51 (1991), to support this contention.

Respondent is basically using Ms. Seidel's arguments relying on community property principles and beneficial recipient as put forth in the companion case to this case in Seidel v. Commissioner, T.C. Memo. 2005-67, to support his argument that petitioner is responsible for the above portions of the CWSC 401(k) plan distribution to Ms. Seidel.

As previously stated, respondent contends that petitioner should be liable for one-half of the QDRO distribution: (1) Due to the community property law of California, or (2) due to the "beneficial receipt of the proceeds by petitioner."

Generally, under section 402(a), a distribution from a qualified retirement plan is taxed to the distributee. Section 402(a) provides in part:

> Except as otherwise provided in this section, any amount actually distributed to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to the distributee, in the taxable year of the distributee in which distributed, under section 72 (relating to annuities).

Under section 402(a), the general rule is that a distribution from an exempt employees' trust (under a tax-qualified employees' plan) is taxed to the "distributee" under section 72, which

generally provides for current taxation of distributions as ordinary income.

The Code does not define the word "distributee" as used in section 402(a); neither do the regulations. The Court has concluded that a distributee of a distribution under a plan ordinarily is the participant or beneficiary who, under the plan, is entitled to receive the distribution. See Darby v. Commissioner, supra at 58; Estate of Machat v. Commissioner, T.C. Memo. 1998-154; Smith v. Commissioner, T.C. Memo. 1996-292.

Section 402(e)(1)(A), however, provides an exception to this general rule. Section 402(e)(1)(A) provides that an "alternate payee" who is the spouse or former spouse of the plan participant shall be treated as the distributee of any distribution or payment made to the "alternate payee" under a "qualified domestic relations order" as defined in section 414(p). Therefore, a distribution made to such an alternate payee under a QDRO will be taxable to the alternate payee, and not to the plan participant, because section 402(e)(1)(A) treats the alternate payee as the distributee.

The Retirement Equity Act of 1984 (REA), Pub. L. 98-397, sec. 204(b), 98 Stat. 1445, added section 414(p), which defines a QDRO. Section 414(p) provides, in pertinent part, the following:

> SEC. 414(p). Qualified Domestic Relations Order Defined.--
> For purposes of this subsection and section 401(a)(13)--
>
> > (1) In general.--

(A) Qualified domestic relations order.--The term "qualified domestic relations order" means a domestic relations order--

    (i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

    (ii) with respect to which the requirements of paragraphs (2) and (3) are met.

(B) Domestic relations order.--The term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which--

    (i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

    (ii) is made pursuant to a State domestic relations law (including a community property law).

Prior to the enactment of the Retirement Equity Act, some courts had held that State law domestic support orders assigning or attaching pension benefits were preempted by ERISA's spendthrift provision. S. Rept. 98-575, at 20 (1984), 1984-2 C.B. 447, 456 (recognizing conflicting decisions). Congress' primary intent in recognizing the QDRO exception was to clarify that these domestic support obligations did not fall within the scope of ERISA preemption. See Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 838-839 (1988).

The parties are in agreement that petitioner's CWSC 401(k) plan meets the requirements of section 401(a).  That being so, distributions from the CWSC 401(k) plan are governed by section 402.

Respondent relies on Powell v. Commissioner, 101 T.C. 489 (1993), in arguing that the funds distributed through the QDRO remained community property and should be taxed as an indirect distribution.  Interpreting Darby v. Commissioner, supra, the Court in Powell v. Commissioner, supra at 498, stated that "an owner was not necessarily a distributee and * * * [that Darby] specifically observed that its statement that a 'distributee' had to be a participant or beneficiary was not an exclusive definition of that word."  Applying the law as modified by REA, the Court in Powell found that the plan participant's former spouse was the "distributee" and thereby taxable on her share of the pension benefits.  Id.

The QDRO incorporated by its own terms the Stipulation and Order filed August 3, 1999.  The QDRO also included a calculation of the community property interest in petitioner's CWSC 401(k) plan and the Stipulation and Order provided for the division of such community property interest.  The terms of the Stipulation and Order governed Ms. Seidel's actions and those of her attorney as to the proceeds received through the distribution from petitioner's CWSC 401(k) plan.  The Stipulation and Order

required Ms. Seidel's attorney to pay out of the fund so distributed, within 30 days of its receipt by him, two liabilities owed jointly by Ms. Seidel and petitioner to First Community Financial Services, and to pay to petitioner $10,000. In fact, Ms. Seidel's attorney made these payments, and Ms. Seidel never actually received the proceeds that went to fulfill these obligations.

Based on the particular facts of this case, we find that under the present QDRO, which by its terms incorporated the Stipulation and Order filed August 3, 1999, Ms. Seidel was alternate payee of only a portion of the distribution; i.e., $51,497. See Seidel v. Commissioner, T.C. Memo. 2005-67. The remainder of $25,503 is attributable to petitioner as beneficiary and distributee, and it consists of $15,503, which is one-half of the two joint liabilities paid off by the proceeds of the CWSC 401(k) distribution, plus the $10,000 check given to petitioner from the proceeds of the CWSC 401(k) distribution, in compliance with the Stipulation and Order.

Therefore, we hold that petitioner is liable for the tax on the indirect distribution which he received in the amount of $25,503. We note that petitioner's distribution from his CWSC 401(k) plan is not one-half of the total community property interest in such plan. We assume such division was a result of

negotiations during the dissolution of petitioner's and Ms.

Seidel's marriage.

As stated in Powell v. Commissioner, supra at 498-499:

Our conclusion is not affected by the fact that initially the entire distribution was made to * * * [Ms. Seidel].  We think * * * [she] received the distribution * * * on behalf of the community and that * * * [her] later payment to * * * [petitioner], * * * [by way of cash and relief of joint liabilities], was a transfer to * * * [him] of funds that at all times belonged to * * * [him].

Respondent's computational adjustment to petitioner's

claimed miscellaneous itemized deductions will be decided by our

holding on the issue.

Reviewed and adopted as the report of the Small Tax Case

Division.

Decision will be entered

under Rule 155.