In the Matter of the MARRIAGE OF Susan McFARLAND and Stephen McFarland and in the Interest of Austin McFarland, Nicholas McFarland, and Connor McFarland, Children.

No. 06–04–00126–CV.

Court of Appeals of Texas, Texarkana.

Submitted Sept. 13, 2005.

Decided Oct. 25, 2005.

Alex Tyra, Law Office of Alex Tyra, Longview, for appellant.

Melissa A. Charles, Longview, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

On September 24, 2004, the trial court entered a final decree of divorce, ending the nearly seventeen-year marriage of Stephen and Susan McFarland. Stephen[1] now appeals the trial court's judgment, contending the trial court erred (1) by awarding spousal maintenance to Susan, and (2) by awarding Susan a disproportionate share of the marital estate. We affirm the judgment of the trial court.

## I. The Trial Court's Findings of Fact and Conclusions of Law

■■■ Often, the parties to a divorce will submit the issue of how to divide the marital estate to the trial court. When that occurs in lieu of a jury trial, and when the trial court issues written findings of fact and conclusions of law, we accord such findings and conclusions the same dignity as should be given a jury's verdict. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). Such was the case here. Consequently, while we must review the sufficiency of the evidence using the usual standard of review[2] as a consequence of resolving Stephen's claims that the trial court abused its discretion, *see Pickens*, 62 S.W.3d at 214, "we may not interfere with the fact finder's resolution of conflicts in the evidence," *see Sabine Towing & Transp. Co. v. Holliday Ins.*

*Agency, Inc.*, 54 S.W.3d 57, 59 (Tex.App.-Texarkana 2001, pet. denied).

## A. Findings of Fact

The trial court's findings of fact that are relevant to the issues presented on appeal are:

12. Susan McFarland had primarily worked in the home as a homemaker. She had no vocational training. She had not worked outside the home until February of 2004 after the divorce was filed.

13. While the divorce was pending, Susan McFarland had worked making $7.00 per hour cleaning a friend's office and answering the phone. She had also worked at several temporary jobs making a maximum of $9.00 per hour.

14. Susan's estimated net monthly income from employment at the time of the divorce was approximately $1200.00 per month; together with estimated child support of $1400.00 from Steve McFarland, her total net monthly income was $2600.00 per month. Her estimated monthly expenses for maintaining the residence, daycare, food, transportation, and miscellaneous items exceeded $4300.00.

15. If Susan McFarland returned to school on a full-time basis, it would be unlikely that she could continue working a full-time job given the young ages of her three children.

16. Susan McFarland's earnings capacity and employment skills required training or education in order for her to become self-supporting.

---

1. To avoid confusion, we will refer to the parties by their first names.

2. *See In re Marriage of Becerra*, 100 S.W.3d 637, 640 (Tex.App.-Texarkana 2003, no pet.) (legal sufficiency standard). A trial court's conclusions of law are not reviewed for factual sufficiency in the context of a bench trial

for division of a marital estate; "instead, we evaluate the trial court's legal conclusions independently to determine whether the trial court correctly drew such legal conclusions from the facts." *Pickens v. Pickens*, 62 S.W.3d 212, 214 (Tex.App.-Dallas 2001, pet. denied).

17. The marital residence ... was recently appraised at $178,000.00 and the mortgage payoff was approximately $143,000.00. The net equity in the residence is approximately $35,000.00. In the event the house is sold, the closing costs and real estate commissions would cost an additional 10% of the market value of the residence and the net equity realized from the sale would be approximately $17,200.00.

18. The parties agreed that Stephen McFarland's pension maintained by Fidelity Investments was worth approximately $245,952.

. . . .

20. The Fort Worth Credit Union account in Stephen McFarland's name had a balance of $2785.00 immediately prior to the divorce.

21. The Fort Worth Credit Union account in Susan McFarland's name had a balance of $45.36 immediately prior to the divorce.

. . . .

25. The net value of the community estate (total community property assets—total community liabilities) at the time of the divorce, not including the sums borrowed from family members[,] was $267,032.40. If the residence was immediately sold, the net value of the community estate would be approximately $17,800 less, approximately $249,232.40.

26. Stephen McFarland was awarded [among other things, his Fort Worth Credit Union account and one-half of the Fidelity pension plan].

27. Stephen McFarland was awarded [the balance to Citibank AA, all debts incurred in his name since January 1, 2004, including the debt for the vehicle he was awarded, the balance of two loans borrowed by the community estate from Stephen's family members, a loan for money from the Fort Worth Credit Union that Stephen used to pay off his credit card debt, and $1,318.84 for various medical bills].

28. Susan McFarland was awarded [among other things, the marital residence, her Fort Worth Credit Union account and one-half of the Fidelity pension plan].

29. Susan McFarland was awarded [debts incurred in her name since January 1, 2004, the debt for the marital residence, her credit card debts, the debt owed to Blockbuster, the balance of a loan borrowed by the community estate from Susan's family members, $512.00 payable to Stephen for one month's vehicle rental, and $389.20 for various medical bills].

30. The total net value of community assets and community liabilities awarded to Susan McFarland was $147,855.50, which was 55% of the net value of the total estate. If she immediately sells the residence, the net value would be approximately $17,800 less considering the 10% in commissions and closing costs for the sale. Then the net value of the estate to Susan McFarland would be approximately $130,055.50, which would be 52% of the net value of the total estate.

31. The total net value of community assets and community liabilities awarded to Stephen McFarland was $119,177, which was 45% of the net value of the total estate.

The trial court's findings regarding Susan's earning capacity and her living expenses were supported by her testimony. She testified that she had been a homemaker for most of the marriage, had allowed her manicurist's license to expire several years ago, and had only recently been able to find employment (from which

she earned between $7.00 and $9.00 per hour because of her limited education, training, experience, and lack of professional licensure). She also testified that her expenses exceed her income by $1,700.00 each month. She testified Stephen had a pension plan currently worth $245,000.00. Finally, Susan submitted evidence regarding the appraised value of the marital residence, the amount of equity the couple had in the home, and the balance owed on the mortgage.

The trial court's findings regarding Stephen's earning capacity were supported by Stephen's own testimony that he earns a base salary of $77,000.00 per year as a pharmaceutical sales representative and that he receives periodic bonuses (suggesting his projected income would be in excess of $80,000.00). During cross-examination by both Susan's attorney and by the children's attorney ad litem, Stephen was forced to admit he had earlier defied a court order prohibiting him from enrolling the children in a private school without first seeking Susan's approval.

Based on the evidence before the trial court, we cannot say the evidence is legally insufficient to support the trial court's findings of fact.

**B. Conclusions of Law**

For purposes of this appeal, the relevant conclusions of law entered by the trial court are:

8. Stephen McFarland was ordered to pay spousal maintenance to Susan McFarland for a period of three years— $1,200.00 per month for the first two years and then dropping to $800 per month in the third year. This spousal maintenance award was based upon the following factors:

- Susan McFarland had primarily been a homemaker during the parties' 17 year marriage.

- Stephen McFarland had a much higher earnings capacity of $87,000 plus per year based upon his estimated salary and bonuses as a pharmaceutical representative.

- If Susan McFarland and the children moved to Arlington, Texas, with the financial assistance and housing provided by family members, her monthly living expenses would be considerably less and she would have the ability to meet her family's monthly living expenses solely on the anticipated child support from Stephen McFarland.

- Although it was Susan McFarland's desire to relocate to Arlington, Texas with the children, she and the children were geographically restricted to Gregg County, Texas in order for Stephen McFarland to visit with the children on a week-to-week rotational basis.

- During the eight months that the divorce was pending, Susan had not been able to support herself with her limited income and child support from Stephen McFarland. Her extended family in Arlington, Texas had provided extensive financial support to her during the pendency of the divorce in order for her to meet her monthly financial obligations.

- Susan McFarland had exercised due diligence in attempting during the pendency of the divorce to obtain suitable employment.

- Susan McFarland had a limited earnings capacity of only $7 to $9 per hour.

- The financial resources available to Susan McFarland at the time of the divorce were not sufficiently liquid to enable her to meet her minimum reasonable monthly needs.

• Susan McFarland needs re-training or education in order to develop the necessary skills to become self-supporting.

• The property awarded to Susan McFarland was not immediately liquid to assist with meeting her monthly financial expenses.

. . . .

13. The division of the assets and debts between the parties was fair, just, and equitable having due regard for Susan McFarland, Stephen McFarland and their three young sons, based upon the following factors:

• The disparity of earnings power between Stephen McFarland's wages as a pharmaceutical representative, and Susan McFarland's ability to earn only $7.00 to $9.00 per hour;

• The ability of Susan McFarland to support herself compared to Stephen McFarland's ability to support himself;

• The ages of the children and the need for the children to maintain a continuity of lifestyles between each household; and

• The education and work history of Susan McFarland compared to Stephen McFarland's education and work history.

We now turn to the issues presented while simultaneously considering whether the trial court correctly drew these legal conclusions from the facts in evidence. See *Pickens,* 62 S.W.3d at 214.

## II. The Award of Spousal Maintenance

Stephen first contends the trial court erred by awarding spousal maintenance to Susan. The final decree of divorce orders Stephen to pay spousal maintenance in the amount of $1,200.00 per month for twenty-four months, followed by a one-year period in which he was required to pay $800.00 each month. Stephen asserts the trial court erred in awarding spousal maintenance because (A) the record does not show Susan requested spousal maintenance, and (B) the trial court failed to recognize Susan received sufficient assets from the division of the marital estate, the sale of which (Stephen contends) would suffice to provide for Susan's immediate financial needs.

### A. Had Susan Requested Spousal Maintenance?

In the amended petition for divorce, Susan asked the trial court "to order that Petitioner [Susan] be paid postdivorce maintenance for a reasonable period in accordance with chapter 8 of the Texas Family Code." Moreover, before receiving evidence and argument on the division of the marital estate, the trial court questioned the parties about what issues remained to be resolved at the bench trial. During that period, the following exchange occurred:

THE COURT: I'm just trying to find out what is at issue.

[Stephen's counsel]: Sure.

THE COURT: They're still fighting over the Bank of America debt?

[Stephen's counsel]: Yes.

THE COURT: And unpaid medical bills?

[Stephen's counsel]: Yes.

THE COURT: *And alimony for her?*

[Stephen's counsel]: *Right.*

THE COURT: Okay. What else?

(Emphasis added.)

■ First, we assume the trial court was referring to spousal maintenance when the court referred to an award of "alimony." "Spousal maintenance" awards are permitted. TEX. FAM.CODE ANN. § 8.051 (Vernon Supp.2004–2005).

Next, our review of the record makes it clear that Susan's pleadings requested an award of "spousal maintenance" and that Stephen knew of this possibility *before the hearing.* Stephen's claim to the contrary is not supported by the record. We now turn to the issue of whether the trial court erred by awarding spousal maintenance given the facts of this case.

**B. Did the Trial Court Err By Awarding Spousal Maintenance?**

 There is a general presumption that spousal maintenance is not warranted "unless the spouse seeking maintenance has exercised diligence in: (1) seeking suitable employment; or (2) developing the necessary skills to become self-supporting during a period of separation and during the time the suit for dissolution of the marriage is pending." TEX. FAM.CODE ANN. § 8.053 (Vernon Supp.2004–2005). A trial court's award of spousal maintenance will not be reversed unless it is shown that the trial court abused its discretion in making such an award. *Pickens,* 62 S.W.3d at 214; *In re Marriage of Hale,* 975 S.W.2d 694, 697 (Tex.App.-Texarkana 1998, no pet.); *DuBois v. DuBois,* 956 S.W.2d 607, 612 (Tex.App.-Tyler 1997, no pet.). A trial court abuses its discretion when it acts without reference to guiding principles or supporting evidence, or when its decision is arbitrary or unreasonable. *In re Marriage of Jeffries,* 144 S.W.3d 636, 638 (Tex. App.-Texarkana 2004, no pet.). "However, the trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision or if reasonable minds could differ as to the result." *Smith v. Smith,* 115 S.W.3d 303, 305 (Tex.App.-Corpus Christi 2003, no pet.). As part of our inquiry into

determining whether the trial court abused its discretion by awarding spousal maintenance, we must necessarily consider whether the evidence supporting that decision by the trial court is supported by factually and legally sufficient evidence. *Hale,* 975 S.W.2d at 697; *see also In re Marriage of Lendman,* 170 S.W.3d 894, 898 (Tex.App.-Texarkana 2005, no pet. h.).

Article 8.051 of the Texas Family Code permits a trial court to award spousal maintenance if:

> (2) the duration of the marriage was 10 years or longer, the spouse seeking maintenance lacks sufficient property, including property distributed to the spouse under this code, to provide for the spouse's minimum reasonable needs, as limited by Section 8.054, and the spouse seeking maintenance:

>> (A) is unable to support himself or herself through appropriate employment because of an incapacitating physical or mental disability;

>> (B) is the custodian of a child who requires substantial care and personal supervision because a physical or mental disability makes it necessary, taking into consideration the needs of the child, that the spouse not be employed outside the home; or

>> (C) clearly lacks earning ability in the labor market adequate to provide support for the spouse's minimum reasonable needs, as limited by Section 8.054.

TEX. FAM.CODE ANN. § 8.051.[3]

In this case, both Susan and Stephen testified they had been married longer than ten years. The trial court received

---

3. Article 8.054 limits the duration of a spousal maintenance award to a period of three years unless the receiving spouse is (A) physically or mentally disabled, (B) unable to work due to the need to care for a custodial infant or young child, or (C) "another compelling impediment to gainful employment." TEX. FAM. CODE ANN. § 8.054 (Vernon Supp.2004–2005).

evidence, without objection from Stephen, that Susan's monthly income and expenses were (without including her credit card bills and making an adjustment for the agreed level of child support) as follows:

**INCOME**

| | |
|---|---|
| Wages | $1,200.00 |
| Child Support | $1,566.54 |
| **Net Monthly Income:** | **$2,766.54** |
| **Total Expenses:** | **$4,298.20** |
| Less Net Income | - $2,766.54 |
| = Monthly Shortfall | = $1,531.66 |

During the marriage, Susan kept the couple's home and tended to their three children, ages three, six, and nine at the time of the divorce. Susan testified that her manicurist's license had expired several years ago, and the only jobs she was able to secure during the pendency of the divorce paid between $7.00 and $9.00 an hour, each position being only temporary. As of the final hearing on the divorce, Susan had not yet been able to secure permanent, higher-paying employment. Susan also lacked any post-secondary education or vocational training that would enable her to secure better employment, but she did plan to pursue post-secondary education once the divorce became final. Stephen, on the other hand, expected to

earn over $80,000.00 from his job as a pharmaceutical sales representative.

In the case now on appeal, the trial court awarded the marital residence to Susan. The couple had approximately $35,000.00 in equity in the home; $143,000.00 was still owed on the mortgage—a significant monthly expense. The remaining significant asset, a retirement fund,[4] was divided evenly. The approximate value of the fund at the time of the divorce was $245,000.00. While one-half of that fund would be a significant amount, the trial court could reasonably assume Susan would not have access to the full $122,500.00, absent severe tax consequences, until she reaches retirement. *See* 26 U.S.C.A. § 408(d)(6) (West Supp.2005). This is because the federal government will treat the $122,500.00 as being now a separate retirement account for Susan. *See id.*

If Susan withdrew any of those funds before retirement, she would owe a significant amount in federal taxes. *See* 26 U.S.C.A. § 408(d)(1) (West Supp.2005). It is likely Susan would be left with less than $100,000.00 after taxes,[5] from which she

---

4. The parties referred to this as a 401K plan.

5. *Cf. Seidel v. Comm'r*, 89 T.C.M. (CCH) 972, 2005 WL 730077 (Mar. 31, 2005). In *Seidel*, the divorce court ordered the division of the ex-husband's 401(k) retirement, with a share going to the ex-wife, a share going to the ex-wife's attorney for payment of those attorney's fees, a portion going to pay a second mortgage on the marital residence, and the remainder to stay with the husband. The ex-husband was not yet eligible for retirement. The tax court held the wife was liable for federal income taxes on the premature, pre-retirement distribution, but the court further held the ex-wife was not liable for the usual ten percent early withdrawal penalty because the distribution was made pursuant to a divorce court's qualified domestic relations order (QDRO). *Id.* (citing 26 U.S.C.A. § 72(t)(2)(C) (excepting distributions from

Chapter 401 retirement accounts from ten percent penalty when distribution made pursuant to QDRO)).

In the case now before us, if Susan withdrew funds from the 401K, she will have to include the amount of the distribution (which she receives from Stephen's 401K) in her total gross income for purposes of calculating her 2005 federal income tax. *See* 26 U.S.C.A. §§ 72(a), 408(d) (West Supp.2005). Even if she withdrew the funds, she may not owe the ten percent penalty usually imposed when a beneficiary prematurely withdraws money from a Chapter 401 retirement plan because, in this case, the distribution received by Susan will be made pursuant to a QDRO. Because the 2005 calendar year is not over, and because the record before us does not inform us of Susan's total wages for 2005 before the trial court granted the divorce, we cannot begin to predict the amount of tax Susan will

would have to pay the mortgage, buy a vehicle,[6] pay for her college tuition and expenses, and pay the remainder of her living expenses for the period during which she was enrolled in college.

■■■ The purpose of spousal maintenance is to provide temporary and rehabilitative support for a spouse whose ability for self support has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support. *O'Carolan v. Hopper,* 71 S.W.3d 529, 533 (Tex.App.-Austin 2002, no pet.) (citing Act of May 26, 1995, 74th Leg., R.S., ch. 655, § 10.01(a), 1995 Tex. Gen. Laws 3543, 3577). Other courts, in considering if a spouse is eligible for spousal maintenance, have upheld the award in situations where the spouse receiving the maintenance obtained substantial property in the divorce proceeding when those capital assets provided insufficient support.

In *Deltuva v. Deltuva,* 113 S.W.3d 882, 888–89 (Tex.App.-Dallas 2003, no pet.), the Fifth Court of Appeals reversed a trial court's award of spousal maintenance because the award's duration was longer than three years, but otherwise approved the general decision to award spousal maintenance. The court noted the wife was awarded "the majority of the marital estate," *id.* at 888, but found there was evidence in the record to support the conclusion that the recipient spouse's living expenses would significantly exceed her income (even after exhaustion of her savings).

In *Lopez v. Lopez,* 55 S.W.3d 194 (Tex. App.-Corpus Christi 2001, no pet.), the husband contended the trial court erred by awarding spousal maintenance to the wife because the latter received sufficient property from the division of the marital estate from which she could provide for her reasonable minimum needs. Ms. Lopez received a home appraised at $59,262.00, a vehicle valued at $7,014.00, the proceeds of the sale of a home in the amount of $33,678.00, and a one-half interest in a Thrift Savings Plan worth $20,778.00. The Thirteenth Court held there was sufficient evidence in the record about the wife's "*de minimus*" education, a physical disability that prevented her from working full time, and her inability to use the property garnered through the divorce settlement to provide for her minimum needs. *Id.* at 199.

In *Amos v. Amos,* 79 S.W.3d 747 (Tex. App.-Corpus Christi 2002, no pet.), the trial court had found that, because of the kind and character of the assets—and as a result of the tax-deferred community property requiring the payment of heavy penalties, interest, and taxes associated with the withdrawal and use of the funds—that the property awarded to the wife was not sufficient to allow her to meet her reasonable needs. *Id.* at 748–50.

In *Trueheart v. Trueheart,* No. 14–02–01256–CV, 2003 WL 22176626, 2003 Tex. App. LEXIS 8154 (Tex.App.-Houston [14th Dist.] Sept. 23, 2003, no pet.) (mem. op.) (not designated for publication), $290,000.00 of community property was awarded to the wife. The court of appeals noted that almost one-half of that consisted of life insurance policies, I.R.A. accounts, and other assets that could not be easily liquidated without significant penal-

---

owe on the distribution, as that tax owed will depend also on what other monies Susan will have earned (such as from traditional employment or from a home business) that might be

included in her gross income for the year 2005.

6. The couple's only vehicle, a leased Ford Expedition, was awarded to Stephen.

ties. The court affirmed an award of spousal maintenance.

In *Alaghehband v. Abolbaghaei*, No. 03–02–00445–CV, 2003 WL 1986777, at *1, 2003 Tex.App. LEXIS 3701, at *7 (Tex. App.-Austin May 1, 2003, no pet.) (mem. op.) (not designated for publication), the wife was awarded about $118,000.00 in community assets. The appellate court noted that several of the assets were retirement accounts and that the tax consequences and long-term financial consequences of early withdrawal would render the liquidity of the assets problematic. *Id.* at *13 n. 1. The court then stated the spouse would exhaust the liquid assets she was awarded (approximately $85,000.00) within two years. *Id.* at *13.

■ Our reading of the cases that have examined the issue of eligibility for spousal maintenance leads us to conclude the trial court in the instant case did not abuse its discretion in awarding spousal maintenance. The primary asset awarded to Susan is the retirement account, which is subject to significant taxes for early withdrawal. Similar amounts of tax-deferred retirement funds have been considered by several courts to lack liquidity due to the substantial monetary disincentives for withdrawal. Here, the trial court found the property awarded to Susan was not sufficiently liquid to enable her to meet her minimum needs. To generate any immediately accessible income from this fund would impose the significant early withdrawal tax consequences discussed previously. While retirement benefits must be considered in determining eligibility for spousal maintenance, we cannot say, based on the facts of this case, that the trial

court abused its discretion in finding the retirement account involved did not bar Susan from maintenance since her available capital assets appear to be insufficient to provide adequate support.[7] Likewise, the home is not a readily liquid asset and is incapable of producing current income. Susan meets all other statutory eligibility requirements for spousal maintenance (more than a ten-year marriage, clearly lacks ability in the labor market to provide for her minimum reasonable needs). Therefore, the trial court did not abuse its discretion in granting spousal maintenance.

### III. Division of the Marital Estate

In his second point of error, Stephen complains that the trial court's division of the marital estate did not result in a "just and right" division of the couple's assets and liabilities. He first complains that Susan should not have been awarded the entire value of the couple's home because the parties had allegedly agreed before trial to sell the marital residence. The only significant difference between Stephen's share of the estate and Susan's share was the award of the home to Susan. Stephen does not specifically complain about the trial court's division of any of the couple's remaining assets or debts.

■ In this case, a number of reasons support the trial court's division. First, if a trial court finds that the terms of an agreement between the parties to a divorce is not "just and right," the trial court is not bound to accept the parties' agreement. TEX. FAM.CODE ANN. § 7.006 (Vernon 1998). Nor is the trial court required to divide the marital estate into

---

7. If Susan withdrew the tax-deferred funds and paid the taxes, she would likely have an asset worth less than $100,000.00. Even a seven-percent return on such investment would not generate sufficient funds to provide for her minimum reasonable needs. (Income shortfall of $1,531.66 per month × 12 months = $18,379.92. A seven-percent return on $100,000.00 principal would yield only $7,000.00.)

equal shares. *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex.1981); *Tate v. Tate*, 55 S.W.3d 1, 10 (Tex.App.-El Paso 2000, no pet.). A trial court may consider a number of factors, including the disparity of income earning potential, in dividing the marital estate. *Murff*, 615 S.W.2d at 698–99. Thus, contrary to Stephen's position on appeal, the trial court was not required to order the house be sold and its proceeds divided among the parties.

Second, the record reflects that, while the parties had seemingly agreed to sell the residence, they left to the trial court the decision of how to divide the proceeds from the sale of that house. In this case, the trial court's decision effectively awarded the entire proceeds from any home sale to Susan. The trial court wrote in its findings of fact that Susan's sale of the marital residence would likely garner her about $17,000.00.[8] Stephen has not challenged this finding on appeal, nor can we conclude that such a finding is unsupported by the record. We will, therefore, defer to that finding under the appropriate appellate standard. *See Anderson*, 806 S.W.2d at 794. Thus, the trial court's decision to award the marital residence to Susan resulted in her receiving assets worth approximately $17,000.00 more than Stephen received. The trial court's findings of fact and conclusions of law noted that, if Susan immediately sold the house, her share of the marital estate would have been approximately fifty-two percent, while Stephen would receive the remaining forty-eight percent. This very small difference of four percent is the result of awarding Susan only one more asset than was given to Stephen (in an otherwise fifty-fifty split of the community property), and we also note that this asset is saddled with a $143,000.00 mortgage.

Third, the trial court appointed both parents as joint managing conservators of the children. Under the trial court's custody order, the couple's children will spend alternate one-week periods with each parent throughout the year, excluding specific holidays. Susan had asked to be allowed to move with the children to the Dallas area; Susan's plan was to enlist the aid of her relatives in caring for the children while she furthered her education. Stephen, however, wanted Susan to be required to remain with the children in Gregg County. The trial court ultimately sided with Stephen on this issue, but the trial court could also have been acting within its discretion by deciding that the price of granting Stephen's residency requirement request would be to award the entirety of the marital residence to Susan.

Fourth, Stephen had admitted violating an earlier order ·by the trial court that prohibited him from enrolling the children in private school without Susan's agreement. If the trial court's decision to not award the home (or a portion of its sale proceeds) to Stephen was influenced by Stephen's .admitted violation of that court's pretrial orders, we cannot say such a consideration was improper, unreasonable, or manifestly unjust in light of the facts of this case.

Given all these reasons, we cannot say the trial court abused its discretion.

## IV. Conclusion

For the reasons stated, we affirm the judgment of the trial court.

---

**8.** The trial court arrived at this figure by assuming the residence would sell at the appraised value, then the court deducted what it believed would be a realtor's standard commission from the equity balance.