Opinion issued August 31, 2012



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00031-CV

————————————

**THOMAS A. EVERITT, Appellant**

**V.**

**JO ANN EVERITT, Appellee**

On Appeal from the 308th District Court
Harris County, Texas
Trial Court Case No. 2008-36728

## MEMORANDUM OPINION

Appellant Thomas A. Everitt appeals from a final decree of divorce entered in favor of appellee Jo Ann Everitt. He challenges (1) the division of the community estate, which was divided in part on the basis of Jo Ann's claim for

constructive fraud, (2) the orders on spousal maintenance, which require Thomas to pay Jo Ann $2,500 per month for up to twelve months, and (3) the orders on child support for their minor child, which exceed the statutory guidelines insofar as they require Thomas to pay for the child's private school and camp costs. We affirm.

## Background

Jo Ann and Thomas Everitt were married in 1988. They obtained college degrees in petroleum engineering, and Jo Ann worked as an engineer for less than a year before the couple agreed that she would stay home to raise their children. For most of the time they were married, the couple lived overseas while Thomas worked as a petroleum engineer. When they separated in June 2008, the couple had been living for three years in Cairo, Egypt with their three sons who were 18, 16, and 10 years old at the time of the separation.

Jo Ann testified that Thomas was a good provider for the family. However, she accused him of habitually making derogatory remarks about her appearance and intelligence during their marriage, including in front of their sons. She also recounted two specific incidents of physical violence, one against her just prior to the separation, and another against their eldest son. Jo Ann also alleged that Thomas repeatedly had been unfaithful with multiple women throughout their marriage. Thomas admitted at trial to one affair early in the marriage. He testified

that he and his wife "grew apart" over the years such that both were mutually at fault for the breakup, but he did not otherwise contradict Jo Ann's testimony concerning his abusive conduct and treatment of her.

Upon separating from Thomas, Jo Ann moved from Egypt to Tomball, Texas and filed for divorce. The pair agreed at the time that their youngest son would live with Jo Ann in Texas while their middle son would live with Thomas in Egypt. During the first year of living in Tomball, Jo Ann enrolled their youngest son in public school, but the following year she enrolled him in a private school. Apart from $600 earned as a substitute teacher, Jo Ann did not earn any income while the divorce was pending.

At the outset of the litigation, the trial court entered agreed injunctions that prohibited both parties from making dispositions of their property except for "reasonable and necessary living expenses" and other specified expenses. Shortly afterward, pursuant to a mediated settlement agreement, the court entered agreed temporary orders that permitted each party to spend up to $4,000 per month for "usual and customary living expenses."

Less than a week before trial, Thomas filed an inventory and appraisal of assets and liabilities purportedly belonging to the community estate and each separate estate. In response, on the first day of trial Jo Ann filed an amended petition alleging that a "large sum of money appears to have disappeared from the

3

community estate without explanation" and that at least some "may have been translated into new assets." Jo Ann further alleged that Thomas "may have acted in violation of the mutual injunctions and the agreed temporary orders in effect in this case," and she sought "a judgment for any and all funds removed from the community estate by [Thomas] in violation of the injunctions and temporary orders in this case." She requested a "just and right" division of the parties' property, spousal maintenance, and child support for their youngest son.

The trial court granted Jo Ann's petition for divorce on the grounds of insupportability, cruelty, and adultery. In its findings of fact and conclusions of law, the court found that Thomas had spent $249,970.56 in violation of the court's temporary orders, and it concluded that the violations constituted constructive fraud on the community estate. The court granted Jo Ann's proposed division of the community estate, whereby she received a greater share of the estate. In addition to awarding Jo Ann several bank and investment accounts as her separate property, the court ordered a judgment of $416,167 against Thomas for "the purpose of a just and right division." The court ordered Thomas to pay spousal maintenance in the amount of $2,500 per month for twelve months, or until Jo Ann obtained employment resulting in income of $2,500 per month after taxes. Thomas was also ordered to pay $1,500 per month in child support, plus all the costs for the minor child's private school and up to $1,000 per year for summer

4

camp. Thomas appeals from the divorce decree with regard to the division of the community estate and the awards of spousal maintenance and child support.

**Analysis**

## I. Division of the community estate

The thrust of Thomas's first issue is that the trial court abused its discretion by recognizing Jo Ann's "waste claim" when it divided the community estate. Thomas contends that the claim was not supported by legally and factually sufficient evidence. We review the trial court's division of the community estate upon divorce for an abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). A trial court abuses its discretion when it acts arbitrarily or unreasonably without reference to guiding rules or principles, or by failing to analyze or apply the law correctly. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). In this context, "legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether the trial court abused its discretion." *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). "A trial court does not abuse its discretion when there is some evidence of a substantive and probative character to support the trial court's judgment." *Miles v. Peacock*, 229 S.W.3d 384, 389 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

5

"Community property owes its existence to the legal fact of marriage, and when the parties to that compact determine their relationship should end, property acquired during marriage is and should be divided among them in a just and right manner." *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998) (quoting *Cameron v. Cameron*, 641 S.W.2d 210, 223 (Tex. 1982)); *see also* TEX. FAM. CODE ANN. § 7.001 (West 2006) (providing that the "court shall order a division of the estate of the parties in a manner that the court deems just and right"). The "just and right" standard is the sole method to account for and to divide community property upon divorce. *Schlueter*, 975 S.W.2d at 588. "Such a standard may at times lead to a disproportionate division of assets and liabilities of the parties, depending on the circumstances that courts may consider in refusing to divide the marital estate equally." *Id.*; *see also Murff*, 615 S.W.2d at 699 (listing non-exclusive factors court may consider in unequally dividing community estate). "When the circumstances demonstrate a reasonable basis for it, a trial court may order an unequal division of community property." *Leax v. Leax*, 305 S.W.3d 22, 34 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

In implementing the "just and right" standard, "Texas recognizes the concept of fraud on the community, which is a wrong by one spouse that the court may consider in its division of the estate of the parties and that may justify an unequal division of the property." *Schlueter*, 975 S.W.2d at 588. "[A] relationship of trust

6

and confidence exists between husband and wife which requires that a spouse's disposition of his special community property to be fair to the other spouse." *Massey v. Massey*, 807 S.W.2d 391, 402 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *accord Knight v. Knight*, 301 S.W.3d 723, 731 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "The breach of a legal or equitable duty which violates this fiduciary relationship . . . is termed fraud on the community because, although not actually fraudulent, it has all the consequences and legal effects of actual fraud because such conduct tends to deceive the other spouse or violate confidences that exist as a result of the marriage." *Knight*, 301 S.W.3d at 731.

A presumption of constructive fraud arises when one spouse disposes of the other's spouse's one-half interest in community property without the other's knowledge or consent. *Mazique v. Mazique*, 742 S.W.2d 805, 807–08 (Tex. App.—Houston [1st Dist.] 1987, no writ); *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ). The presumption may arise even when the other spouse has knowledge of the disposition, so long as she did not also consent to the disposition. *See Zieba*, 928 S.W.2d at 790. Once the presumption of constructive fraud arises, the managing spouse has the burden to show that his disposition of the property was fair to the other spouse. *Massey*, 807 S.W.2d at 402; *Mazique*, 742 S.W.2d at 808. The three primary factors for determining the fairness of the dispositions are: (1) the size of the property disposed of in relation

7

to the total size of the community estate; (2) the adequacy of the estate remaining to support the other spouse after the disposition; and (3) the relationship of the parties involved in the transaction or, in the case of a gift, of the donor to the donee. *Massey*, 807 S.W.2d at 402.

"[T]he court may render a personal judgment against one spouse in order to effect an equitable distribution of the property and as a means to recoup for the defrauded spouse the value of property lost from the estate, by reason of the wrongful acts of the other spouse." *Belz v. Belz*, 667 S.W.2d 240, 247 (Tex. App.—Dallas 1984, writ ref'd n.r.e.). "Of course, the money judgment can only be used as a means for the wronged spouse to recoup the value of his or her share of the community estate lost through the wrongdoer spouse's actions." *Schlueter*, 975 S.W.2d at 588. Therefore, when the community estate has been made monetarily whole, the trial court in its just and right division "may not effect a disproportionate property division *solely* to make up for that formerly lost asset." *Id.* at 590. Nevertheless, if the wronged spouse can prove the heightened culpability of actual fraud, which requires "dishonesty of purpose or intent to deceive" in the disposition of community property, the trial court may consider the fraudulent conduct in making an unequal division. *Id.* at 589–90.

The Everitts agreed to, and the court entered, temporary mutual injunctions which enjoined them from "[s]pending any sum of cash in either party's possession

or subject to either party's control for any purpose, except as specifically authorized by order" of the court. The specifically authorized expenditures included those for "reasonable and necessary living expenses" and "reasonable attorney's fees and expenses in connection with this suit." Also, the temporary injunctions required them to pay insurance premiums.

Three weeks after the injunctions were entered, and pursuant to the parties' mediated settlement agreement, the court entered agreed temporary orders permitting each party to spend up to $4,000 per month for "usual and customary living expenses." The agreed temporary orders stated that "[a]ll prior orders and agreed mutual injunctions shall remain in full force and effect until further order of this court." Thus, upon entry of the agreed temporary orders, Jo Ann and Thomas were not to spend any money for any purpose, except $4,000 per month in usual and customary living expenses and other court-authorized expenditures such as attorney's fees and insurance premiums.

The trial court's authority to enter these orders is derived from the Family Code. *See* TEX. FAM. CODE ANN. §§ 6.501–.502 (authorizing temporary injunctions, temporary restraining orders, and other temporary orders during pendency of divorce proceeding). One purpose of such orders is to temporarily safeguard community property from encumbrance or transfer by one of the spouses pending a final division. *See Morgan v. Morgan*, 657 S.W.2d 484, 493–94 (Tex.

9

App.—Houston [1st Dist.] 1983, no writ).  The trial court may hold a party in contempt for violation of such a temporary order.  *See* TEX. FAM. CODE. ANN. § 6.506.  Additionally, the violation of temporary orders is a factor that a trial court may consider in effecting a "just and right" division of the community estate.  *See Jones v. Jones*, 699 S.W.2d 583, 585 (Tex. App.—Texarkana 1985, no writ); *see also Schlueter*, 975 S.W.2d at 589 (noting that "wasting of community assets" is factor in making just and right division).

Through mediation and in contemplation of temporary orders, Thomas and Jo Ann signed the mediated settlement agreement under which each was allowed to spend $4,000 per month for living expenses.  They mutually agreed, as spouses and fiduciaries, to preserve the remainder of the community estate for a later "just and right" division.  *See Massey*, 807 S.W.2d at 402; *Morgan*, 657 S.W.2d at 493–94.  Because each had the other's consent to spend no more than $4,000 per month, and the agreed injunctions prohibited most other expenditures, the disposition of community property by either party above that limit for a purpose not specifically authorized by the court raises the presumption of constructive fraud.  *See Mazique*, 742 S.W.2d at 807–08; *Zieba*, 928 S.W.2d at 789.  Thus, each spouse, with respect to the community property under their control, had the burden to prove that the disposition of the community estate above the $4,000 monthly limit for an

10

unauthorized purpose was fair to the other spouse.  *See Massey*, 807 S.W.2d at 402; *Mazique*, 742 S.W.2d at 808.

Jo Ann initially calculated that Thomas had spent $647,970.56 above the $4,000 monthly limit during the pendency of the divorce, and she itemized the categories and corresponding amounts of those allegedly overspent funds.  She informed the court that not all of the included expenses were necessarily "improper."  Among the $647,970.56 of Thomas's expenditures itemized by Jo Ann were $76,470.70 in attorney's fees, $9,150.82 paid for insurance, $208,000 for a condominium in Colorado purchased shortly before trial, $130,000 in college savings accounts for the middle and youngest sons, and several other categories of alleged "excess" spending.  At trial, Jo Ann admitted to spending $195,000 of community funds above the $4,000 monthly limit, and thus "credited" that $195,000 against the $647,970.56, thereby leaving a balance of $452,970.56 that she demanded Thomas repay to the community estate.  Subsequently, the trial court subtracted $203,000 for the Colorado condo because it remained a community asset subject to division, thereby leaving a balance of $249,970.56.

In its findings of fact and conclusions of law, the trial court found that Thomas had "spent $249,970.56 of community property in violation of the agreed temporary orders, of the parties' mediated settlement agreement, and of his fiduciary duty to petitioner; which constituted constructive fraud on the community

11

estate." The court further stated that it had taken Thomas's "flagrant violation of orders" into consideration in making a "just and right division" of the community estate.

Thomas asserts that Jo Ann had to establish his "malevolent intent" in order to substantiate her claim, yet there was no evidence that he demonstrated "deceit or dishonesty of purpose" in his handling of community property. But Jo Ann did not have to prove that Thomas had any such subjective intent in order to prevail on her claim for constructive fraud on the community estate. Proof of a "dishonesty of purpose or intent to deceive" is only required for actual fraud on the community, as opposed to constructive fraud on the community. *See Schlueter*, 975 S.W.2d at 589–90. According to the findings of fact and conclusions of law, the trial court found that Thomas had committed constructive fraud, not actual fraud. Thus, this argument by Thomas lacks merit.

Thomas further argues that the trial court erroneously calculated Jo Ann's constructive fraud claim based upon two assets that, according to him, remained in the community estate: the Colorado condominium and the sons' college savings accounts. The record reflects that although the trial court initially included the value of the condominium in the valuation of Jo Ann's constructive fraud claim, the trial court subsequently removed it from that valuation upon Thomas's objection and Jo Ann's stipulation to have it removed. Thus, as to the

condominium, the trial court corrected any possible error and Thomas has not shown that the alleged original error probably caused rendition of an improper judgment. *See* TEX. R. APP. P. 44.1.

As to the college savings accounts, Thomas relies on *Zorilla v. Wahid*, 83 S.W.3d 247 (Tex. App.—Corpus Christi 2002, no pet.), to argue that the funds remained community property and were therefore not wrongfully depleted. In *Zorilla*, the court of appeals affirmed the division of a $600,000 education fund held in one spouse's name as community property. *Zorilla*, 83 S.W.3d at 251. In this case, Thomas testified that he had set up two college savings plans: one for the middle son and one for the youngest son. College savings plans may be established in the name of an adult owner with a minor designated as the beneficiary, or they may be owned by a minor or trust with an adult acting as the account custodian or trustee. *See U.S. v. Kieffer*, No. 1:08-CR-54, 2010 WL 2231806, at *6–7 (D.N.D. April 28, 2010) (discussing two types of college savings plans). Thomas did not testify as to which type of arrangement he opted for, and he did not provide the trial court with any documentation concerning the accounts' legal ownership. By contrast, in *Zorilla*, the education fund was held in one spouse's name, and thus that case is distinguishable. *See Zorilla*, 83 S.W.3d at 251.

Since there is no evidence that Jo Ann consented to the establishment of the college savings accounts, Thomas, as the managing spouse of the funds used to set up the accounts, had the burden to prove the fairness of the disposition to Jo Ann. *See Massey*, 807 S.W.2d at 402. Without any evidence indicating that Jo Ann retained a one-half interest in the college savings accounts or that the accounts had been gifted to the children, the trial court did not abuse its discretion by implicitly finding that Thomas had transferred $130,000 out of the community estate when he established them. *See id.* at 403 (overruling challenge to constructive fraud finding when appellant failed to account for significant sums of money borrowed against community assets).

Thomas also argues that the trial court's evaluation of the constructive fraud claim erroneously included several items he was required or permitted to pay pursuant to the agreed injunctions and temporary orders: insurance premiums, federal income taxes, property taxes and utilities for a vacant lot, and attorney's fees. According to Thomas's appellate brief, the sum of these expenditures is $190,834. However, Jo Ann effectively deducted such items from her constructive fraud claim by crediting $195,000 in Thomas's favor, thereby reducing her claim by more than the amount that Thomas contends should not have been included. Accordingly, we conclude that Thomas has not shown that Jo Ann's proposed

14

calculation in support of her constructive fraud claim probably caused rendition of an improper judgment. *See* TEX. R. APP. P. 44.1.

Thomas additionally argues that the trial court abused its discretion by recognizing a "waste claim" greater than what Jo Ann had requested, improperly using the division of the community estate as a means to punish him, and making a division that left Thomas with a lesser share of the community estate than the trial court actually intended. These are not objections that go to the legal and factual sufficiency of the evidence, and thus it was necessary for Thomas to have made them in the trial court in order to raise them on appeal. *See* TEX. R. APP. P. 33.1(a), (d). The record does not reflect that Thomas raised these objections in the trial court, and we consequently do not address them.

In summary, Thomas has not demonstrated on appeal that the trial court erred in finding constructive fraud on the community estate or in valuing the amount of the wrongfully disposed assets. Accordingly, we overrule Thomas's first issue.

## II.     Spousal maintenance

In his second issue, Thomas argues that the trial court abused its discretion in awarding Jo Ann spousal maintenance of $2,500 per month for up to twelve months. He asserts that Jo Ann was not eligible for spousal maintenance because she did not demonstrate that she had diligently searched for employment, and

because she was awarded a share of the community estate that was sufficient to satisfy her reasonable minimum needs. Jo Ann argues that she established that she could not obtain employment adequate to support her reasonable minimum needs and that the spousal maintenance was proper because the assets awarded to her are not easily liquidated.

"We review the award of spousal maintenance under an abuse of discretion standard." *Dunn,* 177 S.W.3d at 396. "A trial court abuses its discretion when it rules arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence." *Id.* "Under the abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether the trial court abused its discretion." *Id.*

The Family Code establishes criteria for determining the eligibility to receive spousal maintenance and the appropriate amount to be ordered. *See generally* TEX. FAM. CODE ANN. §§ 8.051–.061 (West 2006 & Supp. 2011). During the pendency of this appeal, the Legislature amended several Family Code provisions concerning spousal maintenance. *See generally* Act of June 17, 2011, 82nd Leg., R.S., ch. 486, 2011 Tex. Sess. Law Serv. 1239 (West) (to be codified at TEX. FAM. CODE § 8.051 et seq.). Pursuant to that amending act, we apply the statutes in effect at the time that the divorce suit commenced. *See id.* § 10(a).

16

"The legislative purpose in enacting provisions for spousal maintenance was to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support." *O'Carolan v. Hopper*, 71 S.W.3d 529, 533 (Tex. App.—Austin 2002, no pet.). Spousal maintenance is not property, and the award of spousal maintenance should not factor into a "just and right" division of community property. *See id.*

To be eligible for statutory spousal maintenance, the spouse seeking maintenance must have been married to the other spouse at least 10 years, and she must lack sufficient property to provide for her minimum reasonable needs. She must also meet one of the following criteria: (1) she is unable to support herself because of an incapacitating physical or mental disability; (2) she is the custodian of the couple's child who has a physical or mental disability that requires substantial care and personal supervision, or (3) she "clearly lacks earning ability in the labor market adequate to provide support for the spouse's minimum reasonable needs." *See* Act of June 18, 2005, 79th Leg., R.S., ch. 914, § 1, sec. 8.051, 2005 Tex. Gen. Laws 3146, 3146; *see also Cooper v. Cooper*, 176 S.W.3d 62, 64 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (interpreting substantially similar predecessor statute). "A court that determines that a spouse is eligible to receive maintenance . . . shall determine the nature, amount, duration,

and manner of periodic payments by considering all relevant factors." Act of June 14, 2001, 77th Leg., R.S., ch. 807, § 1, sec. 8.052, 2001 Tex. Gen. Laws 1574, 1575–76. Generally, there is a presumption that spousal maintenance is not warranted unless the spouse seeking maintenance has exercised diligence in either seeking suitable employment, or in developing the necessary skills to become self-supporting while the spouses are separated and the divorce action is pending. *See* Act of June 18, 2005, 79th Leg., R.S., ch. 914, § 2, sec. 8.053, 2005 Tex. Gen. Laws 3146, 3146–47; *Cooper*, 176 S.W.3d at 64.

When considering whether the spouse seeking spousal maintenance will have sufficient property after the divorce to provide for her minimum reasonable needs, the trial court may consider the liquidity of the assets awarded to her and their ability to produce income. *See Dunaway v. Dunaway*, No. 14-06-01042-CV, 2007 WL 3342020, at *3 (Tex. App.—Houston [14th Dist.] Nov. 13, 2007, no pet.) (mem. op.); *In re McFarland*, 176 S.W.3d 650, 659 (Tex. App.—Texarkana 2005, no pet.); *Alaghehband v. Abolbaghaei*, No. 03-02-00445-CV, 2003 WL 1986777, at *5 & n.1 (Tex. App.—Austin May 1, 2003, no pet.) (mem. op.). The term "minimum reasonable needs" is not defined in the Family Code. *Cooper*, 176 S.W.3d at 64. Determining what the minimum reasonable needs are for a particular individual is fact-specific and should be made by the trial court on a case-by-case basis. *Id.* "In considering assets awarded in the divorce, the law does

18

not require a spouse to spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet needs in the short term." *Dunaway*, 2007 WL 3342020, at *3.

**A. Diligence in obtaining employment and necessary skills**

Jo Ann has a bachelor's degree in petroleum engineering. She testified that she searched for an entry-level engineering job after arriving in Texas, submitting resumes to various companies and networking with other engineers. During the pendency of the divorce, Jo Ann was "approved" for a position at a disaster relief company, but she was not hired when funding for a particular project "never came through." At the time of trial, she was scheduled for a follow-up interview with a Scandinavian oil company and for other interviews for a retail company and a management position. Nonetheless, Jo Ann testified that her age, the time elapsed since she last worked, and the difficult economy hindered her efforts to obtain employment. She further testified that she could fill a minimum wage position and that she had been doing substitute teaching while working on her teacher's certification and computer skills. Jo Ann testified to having earned about $600 for having worked six or seven days as a substitute teacher, but various health problems requiring surgery and recuperative therapy prevented her from working more. Conversely, Thomas testified that Jo Ann could have furthered her

19

education or sought a job during the pendency of the divorce, but she instead chose to "just stay home."

The trial court made the following findings of fact:

13.     The duration of the marriage was more than ten years; [Jo Ann] lacks sufficient property, including property distributed to her in the divorce, to provide for her minimum reasonable needs, and presently clearly lacks earning ability in the labor market adequate to provide support for her minimum reasonable needs.

14.     [Jo Ann] has been seeking suitable employment during the time the suit for dissolution of marriage is pending, as well as working to develop the necessary skills to return to the work force and become self-supporting.

15.     The following factors were taken into consideration in determining the nature, amount, duration and manner of periodic payments: Because [Thomas] depleted the liquid assets in the estate, in violation of his fiduciary duty and of the temporary orders, [Jo Ann] will receive little in the way of liquid assets. Until she is able to collect the judgment awarded her, [Jo Ann] will not have sufficient funds to continue her schooling and provide for her minimum reasonable needs. The duration of spousal support is for 12 months, or until [Jo Ann] obtains employment which nets her $2500 per month after taxes, whichever occurs sooner.

A trial court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony and may accept or reject all or any part of that testimony. *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 530 (Tex. App.—Houston [1st Dist.] 1994, no writ). Thus, the trial court had discretion to credit Jo Ann's testimony over Thomas's concerning her diligence in obtaining employment and necessary skills. *See id.* The evidence in this case was sufficient to support

the trial court's conclusion that Jo Ann demonstrated diligence in seeking suitable employment or in developing necessary skills to support herself. *See, e.g.*, *Alexander v. Alexander*, 982 S.W.2d 116, 118–19 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

## B. Sufficiency of property after divorce

Thomas also argues that Jo Ann was not eligible for spousal maintenance because she received sufficient property after the divorce to provide for her reasonable minimum needs. Jo Ann presented a worksheet that itemized the "necessary monthly living expenses" for her and her son, which totaled $7,073. The monthly child support assessed against Thomas—$1,500 for the statutory presumptive amount, $1,150 for private school expenses, and $83 for summer camp—is $2,733 per month. Thomas did not challenge the amount of these expenses in the trial court, nor does he challenge them on appeal. Thus, after subtracting the monthly child support, Jo Ann's remaining monthly expenses total $4,340 per month.

The divorce decree awarded as separate property to Jo Ann several liquid or easily liquidated assets in the form of savings, checking, money market and stock accounts that were worth a combined $87,621 according to the trial court's valuation. Although Jo Ann received several retirement assets worth several hundred thousand dollars, the trial court was not required to consider these illiquid

assets in making its determination of spousal maintenance. *See Dunaway*, 2007 WL 3342020, at *3.

The evidence supported a conclusion that Jo Ann's monthly expenses of $4,340 would consume her liquid and easily liquidated assets in less than 21 months. After including the maximum spousal maintenance award of $30,000 over twelve months, Jo Ann's monthly expenses would exhaust her combined spousal maintenance and liquid and easily liquidated assets in less than 28 months. By comparison, the Family Code in effect at the time of the spousal maintenance order generally allowed a trial court to award an eligible spouse maintenance for up to three years from the date of the order, subject only to the requirement that the maintenance order be limited to the shortest reasonable period to allow that spouse to earn sufficient income to meet her minimum reasonable needs. *See* Act of June 14, 2001, 77th Leg., R.S., ch. 807, § 1, sec. 8.054, 2001 Tex. Gen. Laws 1574, 1576. If the Legislature considered a maximum of 36 months an appropriate outer limit during which a former spouse should pay spousal maintenance, we cannot conclude that the trial court abused its discretion in awarding to Jo Ann liquid and easily liquidated assets and spousal maintenance that would last her up to 28 months. *See, e.g.*, *McFarland*, 176 S.W.3d at 659.

Thomas has not demonstrated that the trial court's order on spousal maintenance constituted an abuse of discretion. Accordingly, we overrule his second issue.

## III. Child support

In his third issue, Thomas challenges the trial court's award of child support to the extent that it exceeded the statutory guidelines. He was ordered to pay $1,500 per month in child support, which is the statutory guideline for one minor child given Thomas's net monthly resources, plus all of the child's private school tuition and costs, and annual camp costs of up to $1,000. Thomas argues that the trial court did not file adequate findings to support the above-guidelines award, as required by statute. He also argues that there was insufficient evidence that the awards for private school and camp expenses were for "proven needs" of the minor child.

Jo Ann argues that the applicable statutes do not require the trial court to file findings of fact when the child support obligor earns a monthly net income of more than $7,500, but even if the statutes do require it, the court made all the findings that Thomas had requested. As to the private school expenses, she argues that the record reflects undisputed testimony concerning the youngest son's additional needs. She alternatively argues that because Thomas requested the trial court order that he pay for the child's private school expenses, Thomas may not complain

about it on appeal. As to the summer camp, she argues that the costs were not disputed by Thomas and that his annual contribution was capped in a way that obligated Jo Ann to share the costs.

## A. Invited error

"As a general rule, the doctrine of estoppel precludes a litigant from requesting a ruling from a court and then complaining that the court committed error in giving it to him." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005). "The doctrine is grounded in justice and dictated by common sense." *Id.* To be estopped from complaining of an alleged judicial error on appeal, the trial court must have taken a specific action that the complaining party requested, and the complaining party must have unequivocally taken a position in the trial court that is clearly adverse to its position on appeal. *See id.* at 862.

At the close of the trial testimony, the trial court ruled that the minor son would go to private school, but the court did not state at that time who would be required to pay for it and in what amount. Thomas did not object to the ruling at that time. During a hearing on the parties' requested relief, Thomas's counsel informed the court that "based on what you told us about your inclination on paying," Thomas was seeking an order that he pay $9,000 per year to the child's private school. The trial court subsequently ordered that Thomas pay all tuition and expenses related to the private school. In his motion for reconsideration,

24

Thomas objected that the evidence did not prove that the child had needs beyond what the statutory presumptive amount could satisfy. The court overruled the objection at a hearing on the motion.

On this record, we do not conclude that Thomas is estopped from challenging on appeal the orders on child support, because the trial court did not take a specific action that Thomas requested. After the trial court ruled that the youngest son would attend private school, Thomas requested that the trial court order that he pay a lump sum of $9,000 per year for tuition. Instead, the trial court ordered that he pay all tuition and related expenses, without a dollar-figure limitation. Because Thomas's request varies from the trial court's order, the invited error doctrine is inapplicable. *See Tittizer*, 171 S.W.3d at 862 (holding no invited error when trial court granted relief similar but not identical to appellant's requested relief). As to the summer camp expenses, there is no indication in the record that Thomas ever requested that he be ordered to pay for that. Thus, Thomas is not estopped on appeal from challenging the above-guidelines child support orders for private school and camp costs. *See id.*

## B. Fact findings

The Family Code provides that the trial court, in rendering an order of child support, shall make certain findings in the child support order if (1) a party files a written request with the court not later than 10 days after the date of the hearing;

25

(2) a party makes an oral request in open court during the hearing; or (3) the amount of child support ordered by the court varies from the amount computed by applying the statutory percentage guidelines, as applicable. TEX. FAM. CODE ANN. § 154.130 (West Supp. 2011). The language in Section 154.130 is mandatory, and in an appropriate case, this court may stay proceedings and direct the court to prepare a supplemental transcript containing the statutorily required findings. *See Chamberlain v. Chamberlain*, 788 S.W.2d 455, 455 (Tex. App.—Houston [1st Dist.] 1990, writ denied). Alternatively, this court may reverse and remand the case for a new trial. *See Hanna v. Hanna*, 813 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1991, no writ).

In this case, the trial court filed "Child Support Findings of Fact" that were, according to the findings, "in accordance with Texas Family Code 154.130." Thomas's challenge to these findings does not go to their existence, but rather to their sufficiency and compliance with Section 154.130. Any alleged error for failure to enter more specific findings is harmless when the complaining party has not demonstrated, or even argued, that the lack of more specific findings prevented him from properly presenting a case to the appellate court. *Kendall v. Kendall*, 340 S.W.3d 483, 514 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Because Thomas has not argued or demonstrated that he was prevented from properly presenting a

case to this court, we conclude that to the extent he challenges the adequacy of the findings, any error in that regard was harmless. *See id.*

## C. Challenges to child support award

A trial court has discretion to set child support within the parameters provided by the Family Code. *Iliff*, 339 S.W.3d at 78. "A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion." *Id.* (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or by failing to analyze or apply the law correctly. *Id.*

The Family Code provides a bifurcated analysis in setting child support, depending on whether an obligor has net monthly resources above or below $7,500. *See Nordstrom v. Nordstrom*, 965 S.W.2d 575, 578 (Tex. App.—Houston [1st Dist.] 1997, pet. denied); TEX. FAM. CODE ANN. § 154.125 (West Supp. 2011); *id.* § 154.126 (West 2008). The trial court found that Thomas's statutory net resources exceeded $7,500 per month, and the parties do not dispute this finding. The pertinent statute concerning the calculation of support for an obligor who has more than $7,500 in monthly net resources reads as follows:

> (a)  If the obligor's net resources exceed [$7,500], the court shall presumptively apply the percentage guidelines to the portion of the obligor's net resources that does not exceed that amount. Without further reference to the percentage recommended by these guidelines, the court may order additional amounts of child support as

27

appropriate, depending on the income of the parties and the proven needs of the child.

(b)     The proper calculation of a child support order that exceeds the presumptive amount . . . requires that the entire amount of the presumptive award be subtracted from the proven total needs of the child.  After the presumptive award is subtracted, the court shall allocate between the parties the responsibility to meet the additional needs of the child according to the circumstances of the parties.  However, in no event may the obligor be required to pay more child support than the greater of the presumptive amount or the amount equal to 100 percent of the proven needs of the child.

TEX. FAM. CODE ANN. § 154.126.  Subsection (a) grants the court discretion to order additional amounts over and above the presumptive award, depending on the income of the parties and the proven needs of the child.  *Nordstrom*, 965 S.W.2d at 579 & n.4.  If the court awards more than the presumptive amount, subsection (b) requires that the court first determine the proven needs of the child.  *Id.* at 579.  If the needs of the child exceed the presumptive award, the court must subtract the presumptive award from those needs.  *Id.*  The court must then allocate between the parties the responsibility to meet the additional needs of the child, depending on the circumstances of the parties.  *Id.*  However, the court is forbidden from requiring the obligor to pay more than 100% of the proven needs of the child.  *Id.*

What constitutes the "proven needs of the child" is not defined by statute. *Id.* (citing *Rodriguez v. Rodriguez*, 860 S.W.2d 414, 417 n.3 (Tex. 1993)). "'[N]eeds of the child' includes more than the bare necessities of life, but is not

28

determined by the parents' ability to pay or the lifestyle of the family." *Rodriguez*, 860 S.W.2d at 417 n.3 (interpreting predecessor child-support statute). "[I]n child support decisions, the 'paramount guiding principle' of the trial court should always be the best interest of the child." *Iliff*, 339 S.W.3d at 81 (quoting *Rodriguez*, 860 S.W.2d at 417 n.3).

### 1. Private school

The Everitts' children had always attended private schools, except for the first year after Jo Ann and her youngest son returned to Texas, during which time the youngest son attended public school. Jo Ann testified that she and Thomas agreed that their youngest son would attend private school in Texas. However, the mediated settlement agreement stated that the youngest son would remain "enrolled in public school determined by attendance zone of [Jo Ann]'s residence." Thomas testified that he did not consent to Jo Ann enrolling his youngest son in private school and that he first learned of Jo Ann's decision when he received the private school's billing statement.

When asked whether she was happy with the public school that her son initially attended, Jo Ann testified:

> Well, [my son] was [happy], I think, his year worked out well. But what I didn't like about it was his class size, what he was accustomed to. It was only fifth and sixth grades and there were probably 15 sixth grade classes—yeah, about 16 sixth grade classes. And I just felt in the classroom there were about 32 kids in each classroom and he had

been accustomed to smaller groups and only maybe three or four of that grade class in that class.

She testified that although the public school was "not an exemplary school," it was "a good school." When Jo Ann attempted to enroll the youngest son in private school, Thomas filed a motion to block it. But Thomas subsequently withdrew the motion after the child's guardian ad litem convinced him that the private school was superior to the local public schools. Jo Ann testified that her son was doing well at the private school, he was happy, he had made friends, and he was playing soccer there. The child's most recent report card showed that he had received grades ranging between "exceeds minimum standards" and "far exceeds minimum standards."

Jo Ann testified that Thomas was unhappy with the public school that the youngest son initially attended. However, Thomas testified that he would have accepted his son attending public school in another part of Harris County. He denied that the youngest son had particular educational needs requiring him to attend private school. At the close of the parties' testimony, the trial court stated that the minor child would "go to the [private] school. It's a very fine school. We will give him an excellent education."

The foregoing testimony supports the trial court's determination that it was in the best interest of the youngest child to remain in the private school. Jo Ann testified to that effect, and she presented a report card showing that her son was

30

performing well there.  As the child's managing conservator, she was in the best position to explain the needs of the child.  *Scott v. Younts*, 926 S.W.2d 415, 421 (Tex. App.—Corpus Christi 1996, writ denied).  Although Thomas refused to pay for his youngest son's private school, he withdrew a motion seeking to enjoin enrollment after the guardian ad litem convinced him that the private school was the superior choice.  The trial court could have reasonably inferred that Thomas recognized that the private school was in the child's best interest.

"In evaluating the needs of the child, and, thus, the exercise of the court's discretion in determining those needs, we are guided by the paramount principle in child support decisions: the best interest of the child."  *Nordstrom*, 965 S.W.2d at 579 (citing *Rodriguez*, 860 S.W.2d at 417 n.3).  Although private school may not be a bare necessity for the minor child, it is not necessarily a lifestyle choice, either.  *See Rodriguez*, 860 S.W.2d at 417 n.3; *Scott*, 926 S.W.2d at 422.  Given the child's good academic performance and social adjustment at the private school, Jo Ann's decision to enroll him there after having tried the public school for one year, and Thomas's decision to withdraw his legal opposition to that enrollment on the advice of the guardian ad litem, we conclude that the trial court was presented with sufficient evidence of the child's best interest and need to remain in the private school.  In light of the evidence and the trial court's broad discretion in child support matters, we hold that the court did not abuse its discretion in ordering

31

Thomas to pay for the child's private school and related expenses. *See Hatteberg*, 933 S.W.2d at 530; *Scott*, 926 S.W.2d at 422.

### 2. Summer camp

Jo Ann requested $115 per week, or $1,380 per year, for the youngest son's camp costs. The trial court's final decree ordered Thomas to pay for one camp activity per year, and it capped his annual contribution for that expense at $1,000. The divorce decree expressly stated that it was the court's intention that the youngest son "enjoy . . . the broadening experiences of a camp each year similar to those of his older brothers."

The part of the decree explaining the order on camp costs apparently references Thomas's testimony. Responding to questions concerning his expenses during the pendency of the divorce, Thomas testified that his older sons had participated in a mandatory summer program organized by their school in Cairo. The program allowed students to visit various foreign countries to study another culture, perform service-oriented activities, or experience an adventure. He testified that the program was "a tremendous opportunity for the kids to go see other parts of the world to understand how other people live" and that it was "important" for the boys to travel and experience such things.

From this testimony, the trial court could have reasonably concluded, as it apparently did, that it was in the youngest son's best interest to have a summer

camp experience similar to what his older brothers enjoyed. Although camp and extracurricular activities "are not bare necessities, we cannot say that they are contrary to the best interests of the child." *Id.*; *see also In re T.A.W.*, No. 02-09-00309-CV, 2010 WL 4813356, at *8 (Tex. App.—Fort Worth Nov. 24, 2010, no pet.) (mem. op.) (overruling challenge that camp and recreation are not needs). Given Thomas's testimony and the broad discretion allowed courts to determine the needs of the child, we hold that the trial court did not abuse its discretion in ordering Thomas to pay for annual camp expenses. *See Hatteberg*, 933 S.W.2d at 530; *Scott*, 925 S.W.2d at 422.

We overrule Thomas's third issue.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

33